**FILED**
United States Court of Appeals
Tenth Circuit

**June 9, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JETAWAY AVIATION, LLC, a
Colorado Limited Liability Company,

Plaintiff - Appellant/Cross-Appellee,

v.

BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF MONTROSE, COLORADO,

Defendant - Appellee/Cross-Appellant,

and

MONTROSE COUNTY BUILDING
AUTHORITY, a Colorado Non-profit
Corporation; JET CENTER
PARTNERS, LLC, a Colorado Limited
Liability Company; BLACK CANYON
JET CENTER, LLC, a Colorado
Limited Liability Company; KEVIN
EGAN; JAMES RUMBLE,

    Defendants - Appellees.

Nos. 12-1173 and 12-1194

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:07-CV-02563-RPM)**

James M. Lyons, Lewis Roca Rothgerber LLP, Denver, CO (Amy D. Wills, Lewis
Roca Rothgerber LLP, Denver, CO; Mark E. Haynes, K.C. Groves, Kelley B.
Duke, and Benjamin J. Larson, Ireland Stapleton Pryor & Pascoe, PC, Denver,
CO, with him on the briefs), for Plaintiff-Appellant/Cross-Appellee.

Bobbee J. Musgrave, Bryan Cave HRO, Denver, CO, for Defendant-Appellee/Cross-Appellant, the Board of County Commissioners of the County of Montrose, Colorado, and Defendant-Appellee Montrose County Building Authority.

Kathryn A. Reilly, Husch Blackwell LLP, Denver, CO, for Defendants-Appellees Jet Center Partners, LLC, Black Canyon Jet Center, LLC, Kevin Egan, and James Rumble.

_____

Before **TYMKOVICH**, **HOLLOWAY**,[*] and **HOLMES**, Circuit Judges.

_____

**PER CURIAM**.

Plaintiff-Appellant JetAway Aviation, LLC ("JetAway") sued

Defendants-Appellees ("Defendants") alleging, *inter alia*, violations of §§ 1 and 2

of the Sherman Act. Defendants are two local governmental entities, the Board of

County Commissioners of the County of Montrose, Colorado (the "BOCC" or the

"County") and the Montrose County Building Authority, and also non-

governmental defendants Jet Center Partners, LLC ("JCP"), Black Canyon Jet

_____

[*] The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, heard oral argument in this appeal. However, Judge Holloway died before the opinions in this case were finalized, and he cast no vote with respect to these finalized opinions. "The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (noting that the circuit court may adopt procedures permitting disposition of an appeal where a remaining quorum of a panel agrees on the disposition). The remaining panel members—Judges Tymkovich and Holmes—have acted as a quorum and, for the reasons stated herein and in their separate concurrences, vote to affirm the judgment of the district court.

2

Center, LLC ("BCJC"), Kevin Egan, and James Rumble.[1] The district court granted summary judgment to Defendants on JetAway's antitrust claims on multiple bases, including that JetAway did not have antitrust standing to bring its claims. JetAway now appeals from this decision, and Governmental Defendants cross-appeal from the district court's denial of summary judgment on state-action immunity grounds.

Acting as a quorum, Judges Tymkovich and Holmes join this per curiam opinion and affirm the district court's judgment. More specifically, both judges conclude that the district court's decision should be affirmed on the ground that JetAway has failed to establish an antitrust injury and, consequently, lacks antitrust standing to bring this action. However, the judges employ different reasoning in reaching this conclusion; their separate concurrences, which are appended hereto, set out their reasoning. The late Judge Holloway took no part in the final resolution of this appeal.

Because this court fully denies JetAway relief at the threshold on the basis of its failure to establish an antitrust injury, it has no need to reach Governmental Defendants' cross-appeal regarding state-action immunity. Accordingly, that cross-appeal is dismissed as moot.

---

[1] When appropriate, the attached concurrences use the abbreviations noted here and, more generally, refer to the BOCC and the Montrose County Building Authority as "Governmental Defendants," and to JCP, BCJC, Mr. Egan, and Mr. Rumble as "Non-Governmental Defendants."

3

In addition, the court addresses here two pending procedural matters—a motion to seal and a motion to strike. JetAway has filed an unopposed motion to seal Volume XVI of its appendix, which contains numerous documents that were under seal in the district court. This motion was provisionally granted by the Tenth Circuit's clerk's office, pending the merits panel's final determination. For the reasons that follow, the court denies the motion to seal.

"Courts have long recognized a common-law right of access to judicial records," but this right "is not absolute." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007); *see, e.g.*, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) ("It is *uncontested* . . . that the right to inspect and copy judicial records is not absolute." (emphasis added)). We may, in our discretion, "seal documents if the public's right of access is outweighed by competing interests." *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) (quoting *United States v. Hickey*, 767 F.2d 705, 708 (10th Cir. 1985)) (internal quotation marks omitted). "In exercising this discretion, we weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Id.* (quoting *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 461 (10th Cir. 1980)) (internal quotation marks omitted). To overcome this presumption against sealing, the party seeking to seal records "must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*,

4

663 F.3d 1124, 1135–36 (10th Cir. 2011) (quoting *Helm*, 656 F.3d at 1292) (internal quotation marks omitted).

On appeal, JetAway does not provide *any* basis for sealing the identified documents; instead, it merely states that the documents were filed under seal in the district court pursuant to a protective order and requests that this court maintain the status quo. Controlling precedent in this circuit—that was readily available to JetAway when it filed its motion to seal—explicitly rejects such an explanation as a sufficient justification for sealing documents on appeal. *See Helm*, 656 F.3d at 1292 ("[T]he parties cannot overcome the presumption against sealing judicial records simply by pointing out that the records are subject to a protective order in the district court."); *see also Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241–42 (10th Cir. 2012) (denying a motion to seal because "[t]he parties' only stated reason for filing these documents under seal [was] that they involve[d] the terms of confidential settlement agreements and/or they were filed under seal in the district court" and "[n]either party [had] submitted any specific argument or facts indicating why the confidentiality of their settlement agreements outweigh[ed] the presumption of public access," and noting that we were "not bound by the district court's decision to seal certain documents").

Under the foregoing precedent, this court clearly could rest its denial of JetAway's motion to seal solely on this lack of justification. However, despite having no obligation to do so, this court has taken the additional step of

5

examining JetAway's motion for a protective order—presented to the district court—to discern whether JetAway has *ever* expressly offered any specific grounds for why the confidentiality of the documents at issue "outweighs the presumption of public access." *Colony Ins. Co.*, 698 F.3d at 1242. JetAway has not; its protective-order motion simply states that, at that time, the parties anticipated the production of confidential and proprietary information during discovery.

However, a generalized allusion to confidential information is woefully inadequate to meet JetAway's "heavy burden." *See Helm*, 656 F.3d at 1292–93 (rejecting as insufficient the parties' sole argument in support of their motion to seal that the documents at issue were "confidential discovery materials that [were] subject to a stipulated protective order entered by the district court"). Thus, even after taking this additional step, this court finds no basis to seal the requested documents; it denies that relief.

And, with limited elucidation required, the court disposes of the second procedural matter. Defendants move to strike JetAway's reliance on notes taken by County Commissioner David White regarding conversations he had with JCP's Kevin Scott. The notes purportedly support JetAway's position that Mr. Scott and Mr. Rumble colluded with Mr. Patterson to ensure that fixed-base operator

6

("FBO") services at Montrose Regional Airport (the "Airport")[2] were privatized and that the County would select JCP as the sole provider of those services. The district court concluded that these notes were inadmissible double hearsay. It is unnecessary to delve into the parties' arguments on this score; even if this court considered the notes, it would conclude that they have no bearing on the dispositive issue—*viz.*, whether JetAway has antitrust standing. Therefore, Defendants' motion to strike is denied as moot.

In sum, by this per curiam opinion, this court **AFFIRMS** the district court's grant of summary judgment to Defendants, **DISMISSES** Governmental Defendants' cross-appeal as moot, **DENIES** JetAway's motion to seal, and **DENIES** Defendants' motion to strike as moot.

---

[2] When appropriate, the attached concurrences use the abbreviations noted here ("FBO" and the "Airport") in reference to fixed-base operator services at the Montrose Regional Airport.

*JetAway Aviation, LLC v. Board of County Commissioners of the County of Montrose, Colorado, et al.*, 12-1173

**HOLMES**, Circuit Judge, concurring:

I join the per curiam opinion that affirms the judgment of the district court. I write separately to explicate my reasoning for concluding that JetAway has failed to establish an antitrust injury and, consequently, lacks antitrust standing to bring this action.

In 2005, the County decided to privatize FBO services at the Airport and requested proposals from private parties. The BOCC received two proposals—one from JetAway and one from JCP. When JCP was selected to provide FBO services at the Airport, JetAway filed the instant lawsuit, alleging that Defendants violated the Sherman Act by manipulating the selection process and excluding JetAway from competing in the FBO services market at the Airport. The district court granted summary judgment in Defendants' favor, concluding, *inter alia*, that JetAway lacked antitrust standing. I would **affirm**.

**I**

**A**

Despite the voluminous record and extensive discovery undertaken in this case, the facts necessary to decide this appeal are relatively few. The difficulties among the parties arose from JetAway's efforts to obtain the right to serve as an FBO at the Airport, which the County runs. An FBO is a commercial business that provides a variety of aircraft-related services, such as fueling, hangaring,

parking, aircraft rental, aircraft maintenance, and flight instruction. From 1991 to January 2006, the County ran the FBO at the Airport.

The BOCC is the governing authority for the County and consists of three members. Beginning in 2002, the BOCC began discussing the need to expand FBO services at the Airport and whether it should privatize these operations. Around the same time, Mr. Scott and Defendants Mr. Rumble and Mr. Egan considered forming JCP for the purpose of operating an FBO at the Airport in the event the County privatized FBO services. In early 2002, Mr. Scott provided the BOCC with a draft request-for-proposal ("RFP") form for the BOCC to use in soliciting bids if it chose to privatize FBO services. Moreover, on April 5 of that year, JCP submitted an unsolicited proposal to the BOCC to be selected as the FBO for the Airport, which was not accepted. In the following years, JCP lobbied for privatization of the FBO services at the Airport. JetAway also was in favor of privatization.

The three members of the BOCC were up for re-election in November 2004. At least two candidates publicly endorsed privatization of FBO services at the Airport: Bill Patterson and Allan Belt. Mr. Patterson and Mr. Belt won two of the three BOCC seats in the November 2004 election and, shortly thereafter, met with Mr. Scott and Mr. Rumble regarding this potential privatization. But support for privatization was not unanimous; in fact, an external consulting firm concluded that the County would economically benefit from continuing to operate

2

the FBO at the Airport.

Also in 2004, JetAway purchased property adjacent to the Airport, from which it began operations as a "through-the-fence" FBO service provider. From this property, JetAway provided non-fuel-related FBO services to the Airport—which, in JetAway's view, placed it in a strong position to be selected by the County as the Airport's FBO if FBO services were privatized.

In early 2005, the BOCC decided that the County should privatize FBO services at the Airport. It therefore published an RFP for a private, on-Airport FBO service provider. The County reserved the right to negotiate with one, two, or several parties that might submit proposals, as well as the right to reject all proposals. The RFP also required each proposal to adhere to the Airport's minimum standards, which at that time explicitly forbade "through-the-fence" commercial operations such as JetAway's.

The County formed an independent committee to evaluate the FBO proposals that were submitted and to make a recommendation to the BOCC regarding whether it should accept one or more of the proposals or decline to privatize FBO operations at the Airport. As it turned out, the County only received two proposals—one from JetAway and one from JCP. Upon evaluation of the proposals, the independent committee recommended against privatizing FBO services at the Airport. Nevertheless, the BOCC voted to enter into negotiations with JCP, even though JetAway's proposal guaranteed a significantly

3

higher payment to the County than JCP's initial proposal.

On December 5, 2005, the County officially privatized FBO services at the Airport and entered into an FBO agreement with JCP that permitted JCP to provide these services on Airport property. That same day, with the assistance of Mr. Scott, the County adopted revised minimum standards for the Airport. Many of these reformulated standards, according to JetAway, made it difficult (if not impossible) for JetAway or any other FBO service provider to effectively compete with JCP.

Despite these setbacks, JetAway continued to negotiate with the County in an attempt to become a second FBO service provider at the Airport. But according to JetAway, the County and JCP were determined to thwart its efforts to compete with JCP in the FBO services market. For example, JetAway has provided evidence that County Attorney Robert Hill was in communication with JCP regarding JetAway's proposal to the BOCC to acquire on-Airport land from which to operate its FBO-services business and that Mr. Hill advised JCP to take action in light of this information to prevent JetAway's acquisition of the land. In the end, the BOCC rejected JetAway's proposals.

JCP began to provide on-Airport FBO services in January 2006. Around this time, JetAway was fueling aircraft on-Airport without the County's consent. In November 2008, the County sought a preliminary injunction to terminate JetAway's access to the Airport, alleging that JetAway violated several Airport

4

safety rules in the course of running its business. The state court agreed with the County and issued a preliminary injunction. Thereafter, the County prevented JetAway from accessing Airport property, and JetAway's off-Airport operation has been closed ever since.

**B**

JetAway filed the instant action against Defendants in December 2007, alleging violations of §§ 1 and 2 of the Sherman Act and, pursuant to 42 U.S.C. § 1983, violations of the Equal Protection Clause and the Commerce Clause.[1] Non-Governmental Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, *inter alia*, that the *Noerr-Pennington* doctrine[2] shielded them from liability. The district court denied their motion, concluding, *inter alia*, that the *Noerr-Pennington* doctrine did not apply.

Governmental Defendants then moved for summary judgment on all of

---

[1] JetAway also alleged that Defendants violated various other federal statutes that preclude the granting of exclusive FBO operations, but voluntarily withdrew that claim before the district court.

[2] The *Noerr-Pennington* doctrine "exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition." *Tal v. Hogan*, 453 F.3d 1244, 1259 (10th Cir. 2006) (quoting *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir. 1997)) (internal quotation marks omitted); *accord Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 894 (10th Cir. 2011); *see generally United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). "The doctrine arises from the [Supreme] Court's conclusion that the Sherman Act was not intended to derogate the First Amendment right of citizens to petition the government for a redress of grievances." *GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 883 (10th Cir. 2005).

5

JetAway's claims. As to JetAway's antitrust claims, Governmental Defendants argued that these claims failed as a matter of law and that Defendants were entitled to state-action immunity.[3] The district court denied the motion and, instead, granted JetAway's motion for additional discovery.

Defendants subsequently filed a second motion for summary judgment, which the district court granted as to all claims. The district court concluded that JetAway's claims under the Equal Protection and Commerce Clauses were meritless. As to JetAway's antitrust claims, the district court concluded this time that the *Noerr-Pennington* doctrine shielded Non-Governmental Defendants from antitrust liability.

Most important for purposes of this appeal, the district court concluded that JetAway did not have antitrust standing to bring any of its antitrust claims. The district court reached this conclusion by focusing on the report of JetAway's antitrust expert, Dr. Philip B. Nelson, which stated that the demand for FBO services at the Airport was only sufficient to support one FBO service provider. In light of Dr. Nelson's report, the court reasoned that "[i]n essence, [JetAway] admits that the size of the business opportunity at the Airport limits that market to

---

[3] State-action immunity, sometimes referred to as *Parker* immunity, generally immunizes a state from liability under antitrust laws for its anticompetitive behavior. *See FTC v. Phoebe Putney Health Sys., Inc.*, --- U.S. ----, 133 S. Ct. 1003, 1010 (2013). This immunity extends to "substate governmental entities" such as the BOCC "when they act pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* (internal quotation marks omitted); *see generally Parker v. Brown*, 317 U.S. 341 (1943).

6

a single FBO operator." Aplt. App. at 6865 (Mem. Op. & Order, filed Mar. 28, 2012).

The district court acknowledged JetAway's contention that "the defendants' protection of JCP from later entry by JetAway has caused injury to the users of the Airport by subjecting them to higher prices and inferior services." *Id.* However, drawing further on Dr. Nelson's report concerning the timing of such competition, the court concluded that any competition between JetAway and JCP would have been relatively short-lived. Specifically, the court stated that "while there may be a period of competition between two competing [FBOs], for a limited time, perhaps one year, the market can sustain only one operator." *Id.* It reasoned that the possibility of such temporary competition did not militate in favor of a finding of antitrust injury. In this regard, the court stated, "It is well established law that the anti-competitive conduct that violates the Sherman Act must have more than a temporary effect on the market." *Id.*

The district court thus ultimately determined that, because ordinarily the Sherman Act does not protect one monopolist from the efforts of another aspiring monopolist to replace it, JetAway could not establish that Defendants caused an antitrust injury. Consequently, JetAway could not establish antitrust standing. The court's antitrust-standing determination was sufficient to shut the door on JetAway's antitrust claims. However, the court proceeded to reach the merits of those claims. Among other things, the court observed: "[T]he allegation is that

7

the County had selected JCP to be the FBO operator even before issuing the RFP. The disputed evidence may support that finding. That, however, is not illegal [under the antitrust laws]." *Id.* at 6863. The court further opined, "It may be that the Commissioners who signed the FBO agreement with JCP did not act in the best interest of their constituents and permitted themselves to be unduly influenced by personalities. That is a matter of political concern; it is not an antitrust conspiracy." *Id.* at 6866. In sum, the district court ruled that Defendants were "entitled to summary judgment of dismissal of the claims of violation of Sections 1 and 2 of the Sherman Act." *Id.* at 6868.

JetAway appeals from the district court's grant of summary judgment to Defendants. Governmental Defendants cross-appeal the district court's decision denying them state-action immunity.

## II

This court "review[s] a grant of summary judgment de novo, applying the same standard as the district court." *Automax Hyundai S., LLC v. Zurich Am. Ins. Co.*, 720 F.3d 798, 803 (10th Cir. 2013) (quoting *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010)) (internal quotation marks omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is

8

such that a reasonable jury could return a verdict for the non-moving party."

*Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013)

(quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004))

(internal quotation marks omitted).

## III

JetAway focuses all of its efforts on appeal on its antitrust claims.[4] The

parties vigorously dispute several aspects of the district court's decision with

respect to those claims. However, it is necessary to address only one issue to

resolve this case: whether JetAway has established an antitrust injury. Under the

controlling law, I conclude that it has not. Consequently, as I see it, JetAway

lacks antitrust standing, and the district court's decision must be affirmed. *See,*

*e.g.*, *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 348 (6th Cir. 2006)

("Although the district court granted summary judgment based on its analysis of

state action immunity, we explicitly do not reach the question of immunity

because we find that the lack of any alleged antitrust injury is more than

sufficient to affirm summary judgment here."); *Fischer v. NWA, Inc.*, 883 F.2d

594, 599 (8th Cir. 1989) ("We affirm the district court. However, we do so on

---

[4] JetAway has declined to pursue on appeal its claims under the Equal Protection and Commerce Clauses by not addressing them in its briefing. Therefore, under our precedent, JetAway has waived any challenge to the district court's grant of summary judgment to Defendants on those claims. *See United States v. Springfield*, 337 F.3d 1175, 1178 (10th Cir. 2003) (holding that the appellant waived claims not raised on appeal); *Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 494 (10th Cir. 2002) (deeming waived a claim raised before the district court but not briefed on appeal).

different grounds: the failure of Fischer to establish that it suffered an antitrust injury as a result of Northwest's acquisition of Republic."); *see also* IIA Phillip E. Areeda et al., *Antitrust Law* ¶ 335f, at 73 (3d ed. 2007) [hereinafter "*Areeda*"] ("[C]ourts usually address standing first because they can often decide standing more readily than liability before trial.").

## A

Section 4 of the Clayton Act gives private parties, such as JetAway, the power to enforce federal antitrust laws. *See* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."); *accord Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003). Here, JetAway brought its federal antitrust claims pursuant to both §§ 1 and 2 of the Sherman Act. Section 1 of the Sherman Act prohibits, *inter alia*, "contract[s]" or a "conspiracy" "in restraint of trade or commerce," 15 U.S.C. § 1,[5] while § 2 prohibits the "monopoliz[ation], or attempt to monopolize . . . trade or commerce,"[6] *id.* § 2. *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280

---

[5] "Under Section 1 agreements 'may be illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.'" *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1123 n.29 (10th Cir. 2005) (emphasis omitted) (quoting *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359–60 (10th Cir. 1989)).

[6] "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful

(continued...)

10

(10th Cir. 2012) (discussing the requirements of, and differences between, §§ 1 and 2 of the Sherman Act); *Elliott Indus.*, 407 F.3d at 1123–24 & nn.29–30 (setting forth the elements of claims made pursuant to §§ 1 and 2 of the Sherman Act).

To pursue such claims under § 4 of the Clayton Act, a plaintiff must demonstrate not only that it has standing under Article III of the Constitution, but also that it has antitrust standing.[7]  *See Tal*, 453 F.3d at 1253; *Elliott Indus.*, 407 F.3d at 1124.  The requirements of antitrust standing "are more rigorous than [those] of the Constitution," *Tal*, 453 F.3d at 1253; a plaintiff "must show (1) an 'antitrust injury'; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws,"[8] *Ashley Creek*, 315 F.3d at 1254

---

[6](...continued)
acquisition or maintenance of that power." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (internal quotation marks omitted).

[7]     The burden to demonstrate antitrust standing is on the plaintiff. *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006).

[8]     This court has also looked to the following six factors in assessing a plaintiff's antitrust standing:

> (1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury—i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment.

(continued...)

11

(quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997)) (internal quotation marks omitted); *accord Tal*, 453 F.3d at 1253.

Whether a plaintiff has suffered an antitrust injury is a "threshold inquiry."[9]

---

[8](...continued)

*Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406–07 (10th Cir. 1992); *accord Elliott Indus.*, 407 F.3d at 1124 n.31; *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962 n.15 (10th Cir. 1990). These six factors "validate" and "give more specificity to the inquiry mandated by the two-part test." *Sharp*, 967 F.2d at 407 n.2. I do not delve into the points of intersection of these two tests, however, because I would resolve this case by concluding that JetAway cannot establish the first prong of the two-part test—antitrust injury. Regardless of which test is applied, antitrust injury is a prerequisite to antitrust standing. *See Elliott Indus.*, 407 F.3d at 1124 ("Antitrust injury and antitrust standing are overlapping concepts; '[s]tanding cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing.'" (alteration in original) (quoting *Sharp*, 967 F.2d at 406)). Parsing these two tests is unnecessary for the additional reason that the "nature-of-the-plaintiff's-injury" factor of the six-factor test essentially asks whether there was an antitrust injury. *See Reazin*, 899 F.2d at 962 n.15 ("The nature of the plaintiff's injury factor is designed to implement the requirement that only *antitrust* injuries are redressable under section 4.").

[9] One commentator asserts that, at least in cases where it is obvious that the plaintiff cannot establish an antitrust violation on the merits, it is a "fool's errand" to engage in an antitrust-injury inquiry. Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 732 (2003); *see also* IIA *Areeda*, *supra*, ¶ 335f, at 76 ("Of course, if the substantive doubt [regarding the existence of anticompetitive conduct] is great enough, the court should grant the defendants summary judgment on the merits, but not by denying standing to sue."). Putting aside the question of whether such a view could be harmonized with our precedent's conception of antitrust injury as a threshold issue, I believe that taking up the antitrust-injury question first under the circumstances of this case is the prudent course: the parties have extensively briefed the issue, and it provides a sound basis for succinctly resolving their dispute. In following this path, however, I "assume the existence of [an antitrust] violation." IIA *Areeda*, *supra*, ¶ 335f, at 75; *see Daniel v. Am. Bd. of*

(continued...)

12

*Abraham*, 461 F.3d at 1267; *see Rural Tel. Serv. Co. v. Feist Publ'ns, Inc.*, 957 F.2d 765, 768 (10th Cir. 1992) (noting that a "plaintiff must show causal antitrust injury"); *Fischer*, 883 F.2d at 599 ("Unless it can establish that its alleged injury was caused by conduct that violates the antitrust laws, a plaintiff lacks standing, under Section 4 of the Clayton Act, to bring an antitrust lawsuit."). This threshold requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)) (internal quotation marks omitted); *see also* Yavar Bathaee, Note, *Developing an Antitrust Injury Requirement for Injunctive Relief that Reflects the Probability of Anticompetitive Harm*, 13 Fordham J. Corp. & Fin. L. 329, 331 (2008) ("The antitrust injury requirement is an integral part of the antitrust standing inquiry. While antitrust standing determines whether the correct plaintiff is before the court, the antitrust injury doctrine ensures that injuries redressed by the Clayton Act are injuries against which the antitrust laws were meant to protect." (footnote omitted)); *cf.* Davis, *supra*, at 723 ("Very simply, the doctrine of antitrust injury requires a court to examine not only *whether* the acts the defendant allegedly

---

[9](...continued)
*Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) (noting that "some courts and commentators have suggested assuming the existence of [an antitrust] violation in addressing the issue of standing").

committed violate the law but also *why* they violate the law.”).

Put another way, an antitrust injury is “an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants’ acts unlawful.” *Tal*, 453 F.3d at 1253 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)) (internal quotation marks omitted); *accord Cohlmia*, 693 F.3d at 1280; *Elliott Indus.*, 407 F.3d at 1124; *Reazin*, 899 F.2d at 962 n.15; *see also* Bathaee, *supra*, at 335 (“To determine whether an antitrust injury exists, one must understand what protections antitrust laws were meant to afford.”).  It is therefore critical to set forth precisely what type of injury the antitrust laws were intended to prevent.  *See, e.g.*, Davis, *supra*, at 723 (“The [antitrust-injury] doctrine, in other words, directs a court to examine, in a proper case, what economic effects the case law rule or statute in question seeks to prevent.”); Bathaee, *supra*, at 335 (“The antitrust injury analysis requires that courts examine the injury sustained, the purpose of the antitrust laws creating the cause of action, and the causal link between the two.”).

“The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.” *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *cf. United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) (“If, as the metaphor goes, a market economy is governed by an invisible hand, competition is surely the brass knuckles by which it enforces its decisions.”).  This proposition applies

14

with full force as to both §§ 1 and 2 of the Sherman Act. *Compare Syufy Enters.*, 903 F.2d at 663 (discussing the Sherman Act's focus on competition in a § 2 case), *with Atl. Richfield Co.*, 495 U.S. at 342 (stating that § 1 asks "whether a restraint [on competition] is 'unreasonable,' *i.e.*, whether its anticompetitive effects outweigh its procompetitive effects"), *and Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 690 (1978) (stating that the § 1 "inquiry is confined to a consideration of impact on competitive conditions").

Moreover, the Sherman Act's goal of preventing unfair competition is pursued with an eye toward safeguarding the benefits that consumers derive from a competitive marketplace. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) ("The bottom line, then, is that antitrust evinces a belief that independent, profit-maximizing firms and competition between them are generally good things for consumers. . . . Experience teaches that independent firms competing against one another is almost always good for the consumer and thus warrants a strong presumption of legality."), *cert. denied*, --- U.S. ----, 134 S. Ct. 1947 (2014); *see also Fishman v. Estate of Wirtz*, 807 F.2d 520, 535 (7th Cir. 1986) ("[T]he enhancement of consumer welfare is an important policy—probably the paramount policy—informing the antitrust laws."); Robert H. Bork, *The Antitrust Paradox* 61 (1978) ("The legislative history of the Sherman Act . . . displays the clear and exclusive policy intention of promoting consumer welfare.").

15

Generally speaking, "the antitrust laws . . . protect competition, not competitors." *Fischer*, 883 F.2d at 599–600; *see Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 697 (10th Cir. 1989) ("[T]he Supreme Court, in a now oft quoted phrase, has stated 'the antitrust laws . . . were enacted for the protection of competition not competitors.'" (omission in original) (quoting *Pueblo Bowl-O-Mat*, 429 U.S. at 488) (internal quotation marks omitted)); *see also Spectrum Sports*, 506 U.S. at 458 ("[The Sherman Act focuses on competition] not out of solicitude for private concerns but out of concern for the public interest."); *Novell*, 731 F.3d at 1078 ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition . . . ."); *Cohlmia*, 693 F.3d at 1280 ("The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm or individual." (quoting *Tal*, 453 F.3d at 1258) (internal quotation marks omitted)); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) ("The Sherman Act ultimately must protect competition, not a competitor, and were we tempted to collapse the distinction, we would distort its continuing viability to safeguard consumer welfare."). As such, "[a] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *SCFC ILC*, 36 F.3d at 972 (quoting *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)) (internal quotation marks omitted).

16

In accord with these principles, the Sherman Act is not concerned with overly aggressive business practices, or even conduct that is otherwise illegal, so as long as it does not unfairly harm competition. *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1225 (10th Cir. 2009) ("After all, it is the 'protection of competition or prevention of monopoly[ ] which is plainly the concern of the Sherman Act,' not the vindication of general 'notions of fair dealing,' which are the subject of many other laws at both the federal and state level." (alteration in original) (quoting IIIB *Areeda*, *supra*, ¶ 770e, at 190)); *Expert Masonry*, 440 F.3d at 348 ("The parties may break a host of state or federal laws and regulations in making a side deal or in otherwise circumventing the bidding process in reaching a final arrangement, but they do not breach Section 1 of the Sherman Act where the alleged vertical agreements involve only one buyer and one seller.").

Thus, consonant with the Sherman Act's statutory concerns, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if [its injury] stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Elliott Indus.*, 407 F.3d at 1124–25 (first alteration in original) (quoting *Atl. Richfield Co.*, 495 U.S. at 344) (internal quotation marks omitted); *see* Michael A. Carrier, *A Tort-Based Causation Framework for Antitrust Analysis*, 77 Antitrust L.J. 991, 997 (2011) ("The legal aspect of antitrust injury doctrine has been important in limiting cases in which the plaintiff cannot show harm related to reduced

17

competition.").

**B**

JetAway contends that it suffered an antitrust injury because Defendants engaged in anticompetitive behavior in the FBO services market by manipulating the bid process rather than allowing market forces to determine which company was the superior FBO service provider. More specifically, JetAway argues that once the County sent out the RFP—initiating an ostensibly competitive bid process—then, in fact, it had "to be a fair and competitive bid process; it [could not] be manipulated." Oral Argument at 3:28, *JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs* (Nos. 12-1173, 12-1194). JetAway asserts that Defendants engaged in precisely such manipulation, unfairly putting a finger on the scales in favor of JCP. The unlawful result, as JetAway sees it, is that it was kept out of the Airport's FBO services market and not permitted to compete head-to-head with JCP.

As previously stated, the district court disagreed, reasoning as follows. Based on the report from JetAway's own expert, Dr. Nelson, the market for FBO services at the Airport could only sustain one FBO service provider,[10] and because

---

[10] The description of the FBO services market at the Airport offered by JetAway's expert, Dr. Nelson, suggests that the market is akin to a natural monopoly. *See, e.g.*, *Nat'l Reporting Co. v. Alderson Reporting Co.*, 763 F.2d 1020, 1023–24 (8th Cir. 1985) ("[A] natural monopoly is a market that can practically accommodate only one competitor. Obviously it cannot be a violation of law to *be* that one competitor, so long as the company in question has attained its success in the market by business acumen,

(continued...)

18

ordinarily the antitrust laws do not prevent one monopolist from taking the place of another, there could be no harm to competition from such substitution and thus no antitrust injury. Even assuming that, but for Defendants' allegedly anticompetitive conduct, there would have been a period of competition between JCP and JetAway, the district court concluded that this too did not establish an antitrust injury, because the competitive period would have been limited (perhaps to one year) and, ultimately, only one of the two FBOs would have emerged as the FBO service provider in the Airport market. The district court essentially concluded that, even if Defendants in some way manipulated the FBO selection process or if their conduct was otherwise unfair, such conduct did not affect competition, and thus JetAway did not suffer an antitrust injury.

For the reasons that follow, I am in substantial agreement with the district court. The district court appropriately identified the material facts that are not genuinely disputed and, in my view, applied sound legal principles to those facts

---

[10](...continued)
superior quality, or other means 'honestly industrial.'" (citing *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429–30 (2d Cir. 1945) (L. Hand, J.))); *Black's Law Dictionary* 1098 (9th ed. 2009) (defining "natural monopoly" as "[a] monopoly resulting from a circumstance over which the monopolist has no power, as when the market for a product is so limited that only one plant is needed to meet demand"); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 369 (1973) ("Each town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail."); *Byars v. Bluff City News Co.*, 609 F.2d 843, 853 n.27 (6th Cir. 1979) (noting that "[t]he classic case is that of a 'natural' monopoly such as that possessed by a utility company in a city" and offering "[o]ther examples of a 'natural' monopoly").

in concluding that JetAway could not establish an antitrust injury.  Therefore, like the district court, I conclude that JetAway lacks antitrust standing.[11]

**1**

Notably, the district court's universe of genuinely undisputed material facts was based in large part on the testimony of JetAway's own expert, Dr. Nelson.  In his report, Dr. Nelson set forth the "structural characteristics" of the relevant market, which he defined as the market for FBO services at the Airport.  Aplt. App. at 3186 (Expert Report of Philip B. Nelson, Ph.D., dated July 15, 2011) (capitalization altered).  He noted that, following Defendants' allegedly anticompetitive conduct, "JCP [was] the only competitor in the relevant market[], which implies that its market share [was] 100%." *Id.*  Next, he analyzed the likelihood of other entrants into this market and concluded that other than JetAway, there were no probable entrants.  Important for purposes of this appeal is one of the bases for Dr. Nelson's conclusion—namely, that "[t]here [was] only enough demand for FBO services at the Airport to support one FBO." *Id.* at 3190. Thus, according to Dr. Nelson, the market could only support one FBO provider; it would be either JCP or JetAway.

As a foundation for his assessment of damages, Dr. Nelson reiterated this

---

[11]      Because JetAway cannot establish the first prong of antitrust standing (antitrust injury), I see no need to reach the second prong of the antitrust-standing inquiry—namely, whether there is "a direct causal connection between that injury and a defendant's violation of the antitrust laws," *Ashley Creek*, 315 F.3d at 1254 (internal quotation marks omitted)—and do not address that issue.

conclusion: "But for the alleged anticompetitive conduct related to the contract selection process, JetAway would likely have been the only FBO at [the Airport]." *Id.* at 3200 (capitalization altered) (internal quotation marks omitted). Dr. Nelson made this determination via several subsidiary conclusions. First, he reasoned that JCP would not have entered the market if JetAway had, because JCP would have operated at a loss. Second, he again recognized that "[t]here [was] not enough demand for FBO services to support two FBOs in the [long run]" at the Airport. *Id.* at 3201 (capitalization altered). Finally, he concluded that "[i]f JetAway and JCP both entered [the market] in January 2006, JetAway was more likely to survive" due to the various competitive advantages JetAway had over JCP. *Id.*

Dr. Nelson summarized his position as follows: "but for the alleged unlawful behavior, JetAway would have negotiated with the County after submitting its RFP response and would have been selected as the sole FBO at Montrose Airport (or JCP would have decided not to compete if it had also been selected)." *Id.* at 3203. He explained that, in the "less likely event" that JCP decided to enter the market anyway and compete with JetAway, "there would have been a *short* period" of competition that would have led to a reduction in JetAway's profits "associated with this *short* competitive period." *Id.* at 3203 n.377 (emphases added). He then calculated the "but-for" damages as if JetAway had been the only FBO service provider from January 2006 forward.

21

Alternatively, Dr. Nelson projected JetAway's damages if, as a result of this litigation, JetAway were permitted to enter the market in January 2012. Under that scenario, Dr. Nelson recognized that "JCP might not immediately stop operations," so he assumed that "JCP would continue to operate its business at a loss for *one year* before ceasing operations." *Id.* at 3208 (emphasis added).

JetAway attempts on appeal to undermine its own expert's characterization of the market in several ways, none of which are availing. First, JetAway argues that there is a genuine dispute of material fact as to whether the FBO services market at the Airport would inevitably be controlled by a monopolist. But the evidence on which JetAway relies does not cast doubt on Dr. Nelson's conclusions.

JetAway specifically points to JCP's representations to the County that two FBOs could compete at the Airport. In May 2005, the County asked JCP whether it would still consider its FBO services proposal viable if the County were "obligated to allow additional FBO operators." *Id.* at 6679 (Letter from Cnty. to JCP, dated May 27, 2005). JCP responded that the presence of additional FBO providers "would not necessarily change the viability of" its proposal, so long as potential competitors were subject to the same requirements as JCP, because JCP intended to outperform the competition. *Id.* at 6682 (Letter from JCP to Cnty., dated May 31, 2005). JetAway also cites the County's representations to the Federal Aviation Administration ("FAA") that a second FBO operator at the

Airport would be feasible.

However, as I see it, this evidence is not inconsistent with Dr. Nelson's report and does not create a genuine dispute of material fact. This is so because Dr. Nelson's report expressly contemplated that JCP and JetAway might occupy the market together as competitors, but concluded that this circumstance would only briefly exist. Ultimately, as suggested by that expert report, the market would be perforce controlled by a lone monopolist. Therefore, JCP's and the County's representations regarding the feasibility of a second FBO in the market are in no way inconsistent with Dr. Nelson's ultimate, critical conclusion that "[t]here is only enough demand for FBO services at the Airport to support one FBO." *Id.* at 3190. Expressed another way, any seeming inconsistency between Defendants' representations and Dr. Nelson's conclusion evaporates when one considers the matter of timing: Dr. Nelson recognized the possibility of two FBOs competing in the Airport's FBO services market; he simply concluded that any period of competition generated by the second FBO would be short-lived.

JetAway attempts, however, to cast doubt on whether any period of competition that might have occurred actually would have been short. To do so, JetAway points to evidence that the County and another company simultaneously provided FBO services at the Airport for a three-year period during the late 1980s and early 1990s. But evidence of a three-year period of competition approximately fifteen years before the time period at issue here does not place in

23

dispute Dr. Nelson's conclusion that, as the market stood *at the relevant time*, a short period of competition between JCP and JetAway would quickly have driven one of the two out of business.

Finally, JetAway argues that Dr. Nelson's one-year estimate regarding the period of possible competition between JCP and JetAway was made only for purposes of estimating damages, and thus the true period of competition that would have resulted between the two FBOs is unknown. However, it was not the precise period of competition between the two FBOs that the district court deemed to be the material fact; rather, it was the fact that any such period of competition would have been short. And Dr. Nelson's report unequivocally supports the notion that *any* period of competition, at most, would have been short.

Thus, even disregarding the one-year figure, the record was not silent or uncertain concerning the period of any competition. It is that "short"—or, as the district court called it, "limited"—time frame of competition, and not the more specific one-year period, that formed the predicate for the district court's legal conclusion that the timing of any competition did not advance JetAway's cause to establish antitrust injury. *See id.* at 6865 (stating that "while there may be a period of competition between two competing [FBOs], for a limited time, *perhaps* one year, the market can sustain only one operator" (emphasis added)). Therefore, the district court's legal reasoning had support in the record

24

concerning the length of any competition.

**2**

In my view, the district court correctly determined that applying these antitrust principles to the genuinely undisputed material facts—most notably, the facts coming from the testimony of JetAway's own expert, Dr. Nelson—doomed JetAway's effort to demonstrate an antitrust injury.

**a**

To start, the district court correctly understood that the mere fact that one monopolist is able to successfully replace another does not harm competition and, therefore, does not effect an antitrust injury. *See* Herbert Hovenkamp, *Federal Antitrust Policy* 663 (4th ed. 2011) [hereinafter "*Hovenkamp*"] ("[I]f the plaintiff's only claim is of the nature 'I, rather than the defendant, was entitled to be the monopolist,' then the plaintiff is not a victim of antitrust injury."); *see also Fishman*, 807 F.2d at 538 ("*Without more*, the substitution of one competitor for another does not implicate the antitrust laws."). The rationale for this is simple: while there is harm to the monopolist who is replaced, there is no harm to the level of competition in the market. *See Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000) (holding that there cannot be a § 1 violation when one monopolist utility seeks to replace another in a "monopoly market" because this only affects competitors, not competition; "consumers will still buy electricity and a utility will still produce it").

Regardless of which entity controls a monopoly, it remains "free to reduce output and increase prices, the standard evils of monopoly power." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 878 (6th Cir. 1991). But it is well-established that the possession of monopoly power alone, "and the concomitant charging of monopoly prices," is not itself unlawful; an antitrust plaintiff must show that the possession of monopoly power "is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis omitted); *see also* 2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* (MB) § 25.02, at 25-11–25-14 (2d ed. 2013) ("Section 2 does not outlaw all monopolies. Section 2 does not condemn mere size or market dominance. Nor does monopoly power in and of itself offend Section 2. It is the acquisition, maintenance, or exercise of monopoly power—not its mere existence—that violates Section 2." (footnotes omitted)). And there can be no anticompetitive conduct—that is, harm to competition—in situations where the *sole* act in question is the replacement of one monopolist by another, as either monopolist can equally "exploit[] a monopoly." *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984). This is why ordinarily the mere act of one monopolist replacing another "is a matter of indifference" to the antitrust laws. *Id.*; *see id.* at 266 ("[A]lthough it hurts the lawful owner of the monopoly power," the "mere[] shift[ing of] a lawful monopoly into different hands . . . has no

26

antitrust significance."); *Oxford Global Res., Inc. v. Weekley-Cessnun*, No.

Civ.A.3:04-CV-0330-N, 2004 WL 2599898, at *3 (N.D. Tex. Nov. 12, 2004)

("The antitrust laws . . . are completely indifferent to the transfer of existing

monopoly power.").[12]

---

[12]    I recognize that the Seventh Circuit, as well as some scholarly literature, has raised the possibility that, under certain circumstances, even when the end result will be the replacement of one monopolist by another monopolist in a market that naturally can support only one firm, an antitrust injury may still stem from the anticompetitive conduct exhibited by the rival would-be monopolists. *See Fishman*, 807 F.2d at 533–35; Davis, *supra*, at 766, 774–75. In *Fishman*, the court observed: "Plaintiffs alleged that they were deprived of a fair shot at winning a legal monopoly. There is no reason why this injury is not an antitrust injury unless the Sherman Act does not protect competition to acquire a natural monopoly—which is precisely what the defendants assert." 807 F.2d at 533. Relying in significant part on the Supreme Court's decision in *Otter Tail*, the *Fishman* court rejected the defendants' assertion—*viz.*, their view that the Sherman Act does not offer protections against anticompetitive conduct by would-be monopolists vying for ascendancy in a natural-monopoly market. *See id.* (noting that *Otter Tail* "involved competition to acquire a natural monopoly and [that the Supreme Court] held that the use of monopoly power to preclude such competition violated the Sherman Act"); *see also Otter Tail*, 410 U.S. at 377 ("The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to [destroy] a competitor, all in violation of the antitrust laws."); *Otter Tail*, 410 U.S. at 370–71 ("The antitrust charge against Otter Tail does not involve the lawfulness of its retail outlets, but only its methods of preventing the towns it served from establishing their own municipal systems when Otter Tail's franchises expired."); *cf. Novell*, 731 F.3d at 1074 (describing *Otter Tail* as the "forebearer of [the] essential facilities doctrine" and noting that the doctrine is "controversial"). In this regard, one commentator has noted:

> Though the issue seldom arises, one must regard it as *an open question* whether dirty pool played by one rival in order to keep another rival from gaining a monopoly position counts as antitrust injury in circumstances where there is bound to be a monopoly in any event and the interests promoted by antitrust will not be impacted, one way or another, by which rival wins the monopoly position.

(continued...)

27

Therefore, in sum, it is clear that a defeated monopolist cannot establish an antitrust injury simply by pointing to the victory of the "substitute monopolist." *See Hovenkamp*, *supra*, at 663; *see also Almeda Mall*, 615 F.2d at 353–54 (holding that there was no antitrust injury because the "mere substitution" of an electricity reseller for the electric company selling directly to consumers did not affect competition (internal quotation marks omitted)); *Digital Sun v. Toro Co.*, No. 10-CV-4567-LHK, 2011 WL 1044502, at *4 (N.D. Cal. Mar. 22, 2011)

_____

[12](...continued)
Davis, *supra*, at 775 (emphasis added).

However, it is important to note that, in the circumstances contemplated by this allegedly open question, a cognizable antitrust injury does not arise from the mere act of *substituting* one monopolist for another—with no appreciable reduction in competition—but rather from the distinct "predatory or exclusionary activity," *id.* at 766, of the monopolist defendant that is calculated to *effectuate* the substitution. *See Fishman*, 807 F.2d at 535 (noting that "[t]he antitrust laws protect against unlawful, exclusionary conduct to acquire a natural monopoly"); *id.* at 536 ("[T]he defendants, through the economic leverage provided by their stadium monopoly, succeeded in driving out all competition for ownership of the [Chicago] Bulls. They used a monopoly in one market to foreclose competition in another—a classic violation of the antitrust laws."); *see also Almeda Mall, Inc. v. Hous. Lighting & Power Co.*, 615 F.2d 343, 354–55 (5th Cir. 1980) (noting that the circumstance of *Otter Tail* "happens when true competition is operative and anticompetitive activity surfaces"); *Byars*, 609 F.2d at 858 ("Otter Tail, among other things, refused to deal when small towns proposed to replace it with their own retail power systems. In that case, Otter Tail used its monopoly power in the wholesale power market to prevent the displacement of its (natural) monopoly in the local retail power market."). However, "[p]redatory pricing appears nowhere in [this] case," *Novell*, 731 F.3d at 1074, and JetAway does not cite *Otter Tail* or *Fishman*, much less allege the sort of "unlawful, exclusionary conduct," *Fishman*, 807 F.2d at 535, present there. Therefore, to the extent that there actually is an open question regarding whether such predatory or exclusionary conduct could give rise to an antitrust injury where the ultimate result is the replacement of one monopolist by another in a natural-monopoly market, I would leave the resolution of that question for another day.

28

(relying on *Columbia River* to hold that there was no antitrust injury when the holder of an exclusive seller's license was "simply . . . replaced" when the license was transferred to another entity); *cf. Four Corners*, 582 F.3d at 1226 (holding that the denial of an opportunity "to *share* in [the defendant's] putative monopoly" was insufficient to establish antitrust injury because even though "[the plaintiff] . . . might be better off with such a shared monopoly, . . . there's no guarantee consumers would be"). The district court correctly discerned the legal import of the genuinely undisputed facts that it identified in the testimony of Dr. Nelson relating to the substitution of one monopolist for another in the Airport's FBO services market.

**b**

The district court also correctly discerned the legal significance of the undisputed material facts regarding the second critical point. Specifically, there was no genuine dispute (as discussed *supra*) that if there were a period of competition between JetAway and JCP, it would have been a short one. The court rightly determined that this meant that any purported deprivation of consumers of the benefits of such competition was of no material significance for purposes of determining the presence of antitrust injury. Putting the court's legal conclusion in context, I note that JetAway has argued vigorously that its exclusion from the market had anticompetitive effects of concern to the antitrust laws because its exclusion prevented consumers from benefitting from what JetAway expected to

be an intense price competition with JCP.

In particular, JetAway asserts that there is no dispute that "JetAway's entry to the market would have led to significant reductions in prices for FBO services at the Airport, if not an all-out price war." Aplt. Opening Br. at 33; *see also* Aplt. Reply Br. at 14–15 ("Defendants also claim that even if prices did decrease, such a decrease would last only one year, which is not a sufficient length of time to constitute harm to competition. . . . [T]his diminishes the competitive importance of the drop in prices that consumers would have enjoyed during that period of time."). In effect, JetAway reasons that Defendants' purported anticompetitive conduct in excluding JetAway from the Airport's FBO services market should be found to have harmed consumers and caused an antitrust injury because it denied consumers the benefits (notably, lower prices) of direct competition between JetAway and JCP—even if those benefits would have only been of limited duration (that is, temporary). I find it pellucid, however, that the district court's contrary reasoning was firmly rooted in settled principles of antitrust law.

In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects. *See Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding that to establish an antitrust injury, there must be "significant and *more-than-temporary* harmful effects on competition," and that the four- to ten-month harm alleged was "temporary" and thus insufficient (quoting *Am. Prof'l Testing Serv., Inc. v.*

30

*Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)) (internal quotation marks omitted)); *Colo. Interstate Gas Co.*, 885 F.2d at 697 (holding that "unfair methods of competition that only threaten to have a transitory impact on the marketplace" do not violate the antitrust laws). This is because the Sherman Act is concerned only with conduct that has "long-run anti-competitive effects." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *see Colo. Interstate Gas Co.*, 885 F.2d at 697 (requiring a § 2 plaintiff "to show that an attempted monopolist's conduct threatened to create *substantial and persistent* changes in the marketplace" and recognizing that such a test "may allow some unfair and potentially harmful methods of competition to go unpunished by the antitrust laws" (emphasis added) (footnote omitted)); *cf. Adaptive Power Solutions*, 141 F.3d at 952 ("To constitute an injury to competition, the restraint must be of significant magnitude and more than trivial." (citation omitted) (internal quotation marks omitted)).

Were temporary effects on competition sufficient, an "ordinary business tort" and an antitrust violation would often be indistinguishable. *See* IIIB *Areeda*, *supra*, ¶ 782a, at 321 (explaining that to avoid invoking § 2 of the Sherman Act "on the basis of torts with insignificant market effects[,] . . . [t]he antitrust court must . . . insist on a preliminary showing of significant and more than temporary harmful effects on competition"); *see also Colo. Interstate Gas Co.*, 885 F.2d at 697 n.26 (recognizing that the Sherman Act is not meant to remedy torts and that

31

"[i]n attempting to distinguish between conduct that should be addressed by the antitrust laws and conduct which should be regulated by tort law, . . . '[t]he antitrust court must . . . insist on . . . significant and *more-than-temporary* harmful effects on *competition*'" (third omission in original) (quoting Phillip Areeda & Donald Turner, *Antitrust Law* ¶ 737b (1978))); *cf. Novell*, 731 F.3d at 1079–80 ("Business torts generally, and acts of fraud more particularly, can sometimes give rise to antitrust liability. At least when the defendant's deceptive actions—usually aimed at third parties in the marketplace—are so widespread and *longstanding* and practically incapable of refutation that they are capable of injuring both consumers and competitors." (emphasis added)). In sum, if the effect on competition is not more than temporary or "transitory," it is of no concern to the antitrust laws. *See Colo. Interstate Gas Co.*, 885 F.2d at 697.

Consequently, in discerning the presence of unlawful anticompetitive conduct, courts have focused on the *long-term* impact of firm conduct on prices, even when the short-term effects might appear (at first blush) to be beneficial to consumers. *See Atl. Richfield Co.*, 495 U.S. at 337 n.7 ("Rivals cannot be excluded in the long run by a nonpredatory maximum-price scheme unless they are relatively inefficient."); *id.* at 351 (Stevens, J., dissenting) ("[N]otwithstanding any temporary benefit to consumers, the unlawful pricing practice that is harmful in the long run to competition causes 'antitrust injury' for which a competitor may seek damages."); *Cargill, Inc. v. Monfort of Colo., Inc.*,

479 U.S. 104, 121 n.17 (1986) ("[T]he likelihood that predatory pricing will benefit the predator is 'inherently uncertain: the short-run loss [from pricing below cost] is definite, but the long-run gain depends on successfully neutralizing the competition . . . [and] on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain.'" (omission and second and third alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986))); *United States v. AMR Corp.*, 335 F.3d 1109, 1114 (10th Cir. 2003) (same); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1181 (7th Cir. 1983) ("The most blatant predatory use of monopoly power theoretically is, of course, a quick price cut upon entry until the competitor withdraws, at which time prices are raised back to monopoly levels to recoup the temporary losses sustained."); *see also* William J. Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing*, 89 Yale L.J. 1, 26 (1979) ("An attempt to provide a universally acceptable definition for a vague term such as 'predatory pricing' probably can contribute little. However, the term does relate to a problem that is real and significant—the design of means to permit full and fair competitive measures by the established firm, without foreclosure of entry. The problem clearly involves intertemporal behavior patterns that cannot be addressed adequately by the comparison of prices and costs *at any single moment*." (emphasis added) (footnote omitted)); F.M. Scherer, *Predatory Pricing Under Section 2 of the Sherman Act*, 89 Harv. L. Rev.

33

868, 885 (1976) ("The essence of exclusionary pricing is sacrificing profits today to enhance market power, prices, and profits tomorrow. If future prices will be higher relative to costs than they would have been in the absence of today's price cutting, any correct reckoning of the welfare effects of exclusionary pricing must take into account the future efficiency losses as well as current gains or losses.").

Here, the anticompetitive effects were the product of Defendants' allegedly improper exclusion of JetAway from the Airport's FBO services market, where JetAway would have engaged in head-to-head competition with JCP and purportedly produced lower prices for consumers. But, if that competition and the resulting lower prices would have been temporary, it naturally follows under the controlling law that the anticompetitive effects of Defendants' conduct that prevented the competition from taking place would have been temporary as well.

In other words, the benefits flowing to consumers from a competitive FBO services market and the anticompetitive effects of Defendants' allegedly unlawful conduct—which prevented such a competitive marketplace from emerging—were, in a sense, two sides of the same coin. And, importantly, the coin was made of perishable stuff. After the competition between JetAway and JCP ceased, the market would naturally have become once again the preserve of a sole monopolistic firm—and, as noted, the existence of a monopoly is not itself

anticompetitive or a violation of the antitrust laws.[13]  *See, e.g.*, *Trinko*, 540 U.S.

at 407; *see generally* von Kalinowski, *supra*, § 25.02.  Therefore, under settled

principles of antitrust law, the district court correctly reasoned that, because any

competition between JetAway and JCP in the Airport's FBO services market

would have been of limited duration, the anticompetitive effects associated with

the absence of that competition were not a material variable in the antitrust-injury

calculus and did not help JetAway to establish an antitrust injury.

**3**

In sum, the foregoing evidence demonstrates that JetAway cannot establish

antitrust injury and thus cannot establish antitrust standing.  The undisputed

evidence reveals that the FBO services market would be controlled by a

monopolist because there was insufficient demand for FBO services at the Airport

to support two FBO firms.  As discussed *supra*, ordinarily the identity of the

monopolist is of no concern to the antitrust laws because the simple act of one

monopolist replacing another does not adversely affect competition.  *See*

---

[13]     This is why JetAway's argument that it "does not seek to replace JCP as the monopoly FBO at the Airport, but to enter the relevant market and compete with JCP" is unavailing.  Aplt. Opening Br. at 35.  Had JetAway been allowed to compete with JCP in the FBO services market, only one of the two firms would have survived as the sole occupant of the market—the monopolist—after at most a short period of competition.  Therefore, ultimately, the only thing JetAway could have hoped to do by entering the market was to displace JCP, not compete with it.

*Columbia River*, 217 F.3d at 1190;[14] *Brunswick Corp.*, 752 F.2d at 266–68;

*Hovenkamp*, *supra*, at 663.  In the unlikely event that a period of competition

between the two conceivable firms—JetAway and JCP—ensued, it would have

been short and would not have had any long-term effects on the FBO services

market.  Such a brief period of competition would not have altered the

competitive landscape.  Consequently, like the identity of the monopolist,

---

[14]     JetAway attempts to distinguish *Columbia River* on two distinct grounds, neither of which is persuasive.  First, JetAway argues that *Columbia River* involved the merits of a § 1 claim rather than antitrust injury, and that these two inquiries are distinct. JetAway is correct that "[t]he purpose of the antitrust injury requirement is different" than the § 1 analysis, and thus each "must be shown independently." *Atl. Richfield Co.*, 495 U.S. at 342, 344 (internal quotation marks omitted); *see Daniel*, 428 F.3d at 437 ("[I]t is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it.").  But the Supreme Court has explained how the inquiries overlap.  Anticompetitive conduct can have three "interwoven" effects: it "may reduce competition, . . . increase competition, and . . . may be neutral as to competition." *Atl. Richfield Co.*, 495 U.S. at 344.  The antitrust-injury requirement is distinct because it is only met "if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.*  If, as in *Columbia River*, a court holds that certain conduct does not violate the Sherman Act because it does not reduce competition, it follows ineluctably that the same conduct is insufficient to establish antitrust injury, which must find its cause in the "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co.*, 495 U.S. at 344; *cf.* Davis, *supra*, at 742 ("Choosing A over B as one's exclusive distributor for a territory is not an antitrust violation at all, because whether A is chosen or B is chosen, competition remains the same.  There was no predicate antitrust violation." (footnote omitted)).  Therefore, JetAway's efforts to distinguish *Columbia River* are misguided.

Second, JetAway asserts that *Columbia River*, unlike this case, involved a state-sanctioned monopoly.  But the reasoning of *Columbia River* was not dependent on the state-sanctioned status of the monopoly.  Moreover, the rationale underlying *Columbia River*—that competition is not harmed simply by the replacement of one monopolist with another—holds true regardless of whether the monopoly is sanctioned by the state or is dictated by market forces.

36

ordinarily it would be of no concern to the antitrust laws. *See Adaptive Power Solutions*, 141 F.3d at 952;[15] *Colo. Interstate Gas Co.*, 885 F.2d at 697; *see also* IIIB *Areeda*, *supra*, ¶ 782a, at 321–22. Accordingly, I would hold that JetAway has failed to establish that Defendants' conduct effected an antitrust injury; therefore, it does not have antitrust standing to bring its antitrust claims. *See Tal*, 453 F.3d at 1253; *Elliott Indus.*, 407 F.3d at 1124.

## C

Next, I would expressly address and reject two broad lines of argument advanced by JetAway by which it seeks to undermine the district court's conclusion that it has not established an antitrust injury.

## 1

Relying on this court's decision in *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999), JetAway argues that "[c]onduct that eliminates one of two competitors or excludes a potential competitor from a relevant market harms competition." Aplt. Opening Br. at 29. I have no doubt that under certain circumstances, such as those in *Full Draw*, this is true. Such

---

[15] JetAway attempts to distinguish *Adaptive Power Solutions*, arguing that in that case, following the temporary harm to competition, there was an additional competitor in the relevant market; that is, in the end, competition actually increased. But this fact was not determinative for the Ninth Circuit's ultimate conclusion. Instead, the court focused on the fact that the harm to competition needed to be "*more-than-temporary*" and that the harm at issue "was, at most, temporary." *Adaptive Power Solutions*, 141 F.3d at 952 (internal quotation marks omitted). The same is true here. Further, and more importantly, this court recognized the very same principle in *Colorado Interstate Gas Co. See* 885 F.2d at 697.

circumstances, however, are not present here.

A brief examination of the facts and reasoning in *Full Draw* demonstrates why its conclusion is not controlling here. In *Full Draw*, the plaintiff was an archery trade-show promoter who brought an antitrust suit against several defendants who were archery-product manufacturers and distributors and also a trade association to which the other defendants belonged. *See* 182 F.3d at 747–48. After the plaintiff rejected the trade association's offer to purchase the plaintiff's trade show, the trade association began its own trade show to rival the plaintiff's. *See id.* at 748. Following two years of competition between the two trade-show organizers, the trade association and the other defendants allegedly organized a group boycott of the plaintiff's trade show and drove it from the market. *See id.* We held that the defendants' conduct injured competition, stating, "We have no doubt that alleging the loss of one of two competitors *in this case* alleges injury to competition." *Id.* at 754 (emphasis added).

According to JetAway, the reasoning of *Full Draw* prompts the same conclusion here. As was true in *Full Draw*, says JetAway, there were two competitors in the Airport's FBO services market—it and JCP—and Defendants' anticompetitive conduct effectively precluded JetAway from competing in the market. However, the structure of the market in *Full Draw* was markedly different than the structure here—notably, prior to the commencement of the allegedly anticompetitive conduct, consumers in *Full Draw* had a meaningful

38

choice between two competitors, and we found this fact to be significant in evaluating whether the defendants' conduct produced an antitrust injury. In that regard, we reasoned:

> In particular, as alleged in the second amended complaint, from 1995 to 1997, both [the trade association] and the [plaintiff] competed for customers for their 1997 trade shows. Thus, from the market's perspective, there were actually two competitors during that period. As a direct result of defendants' boycott, [the plaintiff] was driven from the market in 1997, thereby depriving consumers of their *pre-existing choices* in that market. Because defendants' alleged boycott reduced a competitive market of two producers to a market of one monopolist, [the plaintiff] quite clearly alleged substantial injury to competition from defendants' group boycott.

*Id.* (emphasis added).

It should be patent that the effects of the defendants' allegedly anticompetitive conduct in *Full Draw* differ from the effects of Defendants' allegedly anticompetitive conduct on the FBO services market here. As detailed above, the undisputed evidence is that, in all events, there would only be one FBO service provider at the Airport. This was not because of Defendants' conduct, but because "[t]here is only enough demand for FBO services at the Airport to support one FBO." Aplt. App. at 3190. The natural composition of the market here consists of one FBO—that is, one monopolist. Thus, unlike in *Full Draw*, Defendants' allegedly anticompetitive conduct did not have the effect of "reduc[ing] a . . . market of two [service providers] to a market of one monopolist," 182 F.3d at 754; rather, the structure of the market itself dictated

39

that there could be no more than one firm (i.e., monopolist).  In other words, unlike the situation in *Full Draw*, Defendants' conduct did not change the composition of the FBO services market such that competition was reduced and an antitrust injury was effected.  *See Christy Sports*, 555 F.3d at 1197–98 (distinguishing *Full Draw* on the grounds that in *Full Draw*, the "defendants actively invaded another market through anticompetitive behavior and substantially changed what that market looked like").  More specifically, Defendants' conduct did not deprive consumers of a meaningful, *long-term* choice between two competitors.  At most, by virtue of their allegedly anticompetitive conduct, Defendants in this case selected which of two competing FBO service providers would be installed as the monopolist in a market that could only support one FBO service provider.  As explained *supra*, such a shifting of a "monopoly into different hands . . . has no antitrust significance."  *Brunswick Corp.*, 752 F.2d at 266; *see Columbia River*, 217 F.3d at 1190; *Hovenkamp*, *supra*, at 663.  Thus, in my view, *Full Draw* is distinguishable, and JetAway's reliance on it is misplaced.

**2**

JetAway's final attempt to carry its burden of demonstrating an antitrust injury is also unavailing.  It argues that the requisite harm to competition needed to show antitrust injury is evinced by the decline in the quality and quantity of the FBO services at the Airport that occurred as a result of Defendants' exclusion of

40

JetAway from the market.[16]

Specifically, JetAway contends that, had Defendants not excluded it from the market, it would have provided higher quality FBO services than JCP and more of them. JetAway further claims it would have done so even after it drove JCP from the market and was the sole monopolistic firm, because of its superior facilities and Airport location. Thus, reasons JetAway, Defendants' anticompetitive conduct harmed consumers. This argument is legally infirm. Most saliently, even if JetAway would have been a better monopolist for consumers in the sense that it would have provided a more diverse, higher-quality

---

[16]  In this same vein, JetAway contends that because of Defendants' anticompetitive exclusion of it from the FBO services market, the prices faced by consumers were higher. Based on the reasoning and authorities explicated *supra* in Part III.B.2, I find that argument unavailing. In brief, even if I were inclined to find an antitrust injury if it could be shown that Defendants' allegedly anticompetitive conduct had the effect of increasing prices for consumers in the long run, JetAway has introduced no evidence to this effect. JetAway's only evidence is that prices would have decreased for a *short* period during its posited head-to-head competition with JCP. Yet, as noted in Part III.B.2.b, such a temporary effect on prices is of no moment in the antitrust-injury inquiry. *See Adaptive Power Solutions*, 141 F.3d at 952; *Colo. Interstate Gas Co.*, 885 F.2d at 697. Only one competitor (as between JCP and JetAway) would have emerged as the monopolist in the Airport's FBO services market, and that surviving competitor would have been "free to reduce output and increase prices, the standard evils of monopoly power." *HyPoint Tech.*, 949 F.2d at 878. In other words, the decline in prices for consumers caused by competition between JetAway and JCP only would have been short-lived; monopoly power would have been re-established, and the prevailing monopolist, "as a rational profit-maximizer," would have sought to extract monopoly profits from consumers, making "[t]he price to the consumer . . . the same" as it would have been under the defeated monopolist. *See Brunswick Corp.*, 752 F.2d at 267. Thus, JetAway's suggestion of an antitrust-injury on this basis—*viz.*, its contention that, due to the allegedly improper exclusion of JetAway's competing presence in the FBO services market, consumers were forced to pay higher prices—is unpersuasive and misguided under the circumstances of this case.

41

array of FBO services, it cannot be said that Defendants' conduct harmed *competition*; thus JetAway cannot establish an antitrust injury. *Cf.* Davis, *supra*, at 742 ("Choosing A over B as one's exclusive distributor for a territory is not an antitrust violation at all, because whether A is chosen or B is chosen, competition remains the same. There was no predicate antitrust violation." (footnote omitted)).

It is true, as JetAway contends, that "[a]n antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (internal quotation marks omitted); *accord Cohlmia*, 693 F.3d at 1281. But the primary import of such a statement is that an antitrust plaintiff must prove harm to the market's competitive landscape, rather than harm flowing only to itself. Courts do look to whether the alleged anticompetitive conduct adversely affected, *inter alia*, the "quantity or quality of goods or services," but only for clues as to whether there have been effects "on competition as a whole within the relevant market." *Id.* (emphasis omitted) (citations omitted) (internal quotation marks omitted). Merely pointing to a decline in the quality or quantity of goods or services does not establish the presence of an antitrust injury absent injury to competition. *See Christy Sports*, 555 F.3d at 1199 (holding that allegations that the defendant's conduct resulted in "a decline in quantity and increase in price" of the product at issue did not demonstrate that the defendant's

42

conduct had "anticompetitive effects" because none of the defendant's underlying conduct was itself anticompetitive).

Such changes in quantity and quality in the market may well be the *consequences* of harm to competition—*viz.*, the presence of such changes may provide the foundation for a reasonable inference that competitive harm is also present. *See, e.g.*, *Syufy Enters.*, 903 F.2d at 668 ("[C]ompetition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits. When a producer is shielded from competition, he is likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal."). However, it does not ineluctably follow that competition has been adversely affected whenever there has been a diminishment in the quality or quantity of goods or services in the market. Put another way, a decline in consumer benefits in a given case is not necessarily traceable to an injury to competition. *See Fishman*, 807 F.2d at 536 ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect. A healthy and unimpaired competitive process is presumed to be in the consumer interest."); *id.* at 538 ("The fact that the precise impact of defendants' conduct on the broad consuming public has remained unfocused here does not prevent a finding that the antitrust laws have been violated."); *see also Christy Sports*, 555 F.3d at 1199 (finding no harm to

43

competition *despite* allegations of increased prices and decreased output).

Were this court to find antitrust injury whenever a would-be monopolist maintains that in a particular case it would be a better monopolist for consumers than the incumbent monopolist due to the comparative quality of the goods or services that it would provide, we would lose sight of the injury that the antitrust laws are meant to guard against—injury to competition—which "[e]xperience teaches . . . is almost always good for the consumer." *Novell*, 731 F.3d at 1073; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("[T]he Sherman Act was enacted to assure customers the benefits of . . . competition."). Thus, homing in on injury to competition, the relevant question becomes whether the conduct at issue has *reduced* competition. *Elliott Indus.*, 407 F.3d at 1124–25 ("[T]he antitrust injury requirement ensures that a plaintiff can recover only if [its injury] stems from a competition-*reducing* aspect or effect of the defendant's behavior." (internal quotation marks omitted)); *see Spectrum Sports*, 506 U.S. at 458 (noting the Sherman Act's focus on "conduct which unfairly tends to destroy competition"); *see also City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 266–67 (3d Cir. 1998) ("[B]ecause neither the agreement nor the proposed merger had brought about the lessening of competition in a 'marketplace' where there was no competition, there was no antitrust injury."). As I have explicated in Part III.B.2, *supra*, there is no evidence here that Defendants' conduct reduced competition.

44

It becomes clear, then, that JetAway actually calls upon this panel to engage in the wrong inquiry. Specifically, rather than asking for an evaluation of whether there would be a reduction in competition, JetAway asks the panel to evaluate whether it would have been a better monopolist than JCP. This is akin to asking a court to decide what company *deserves* to be the monopolist in a given market, which is not an appropriate area of judicial inquiry under the antitrust laws. *See, e.g.*, *Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 933 (C.D. Ill. 1990) ("It is also not a legitimate business justification [for antitrust purposes] to suggest that the defendant would be a 'better' provider of the particular product or service than its competitors.").

Notably, the thrust of JetAway's argument—that the quality and quantity of a monopolist's products and services should be deemed relevant to the antitrust-injury inquiry—is directly at odds with the principle that the identity of a monopolist is of no concern to antitrust law. *See, e.g.*, *Brunswick Corp.*, 752 F.2d at 266 (noting that "merely shift[ing] a lawful monopoly into different hands . . . has no antitrust significance"); *Hovenkamp*, *supra*, at 663 ("[I]f the plaintiff's only claim is of the nature 'I, rather than the defendant, was entitled to be the monopolist,' then the plaintiff is not a victim of antitrust injury."). Under JetAway's argument, the identity of the would-be monopolist would be critical in determining the existence of an antitrust injury because it would inform a court's judgment regarding the quality or quantity of goods or services that consumers

45

could reasonably expect to receive.

However, antitrust injury cannot be predicated on a court's evaluation of the quality or quantity of a would-be monopolist's products or services, rather than on an evaluation of whether competition would be reduced in the relevant market. *Cf. Expert Masonry*, 440 F.3d at 348 ("[W]e decline to extend antitrust liability to give succor to dejected buyers or sellers who simply allege that one buyer and one seller colluded to reach a deal that may or may not have been inferior to the deal offered by the disappointed party."). At bottom, JetAway asks the panel to compare the FBO services offered by it and JCP and then to predict which entity's services would be superior. I decline to engage in this dubious undertaking. And, even if there were some legal foundation for such an exercise, "[a]dministrability considerations" would nonetheless dissuade me from moving down that path. *Novell*, 731 F.3d at 1073.

Courts lack a principled method to determine which services provide greater benefit to consumers. *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1000 (6th Cir. 1999) ("Manifestly, the judiciary is ill-suited to evaluate directly the efficiency of business practices."); *cf. Four Corners*, 582 F.3d at 1226 (rejecting the notion that the court should force the defendant monopolist to share its monopoly with the plaintiff because, *inter alia*, "[t]he federal judiciary is not a price control agency"); *Four Corners*, 582 F.3d at 1226 ("[A]ntitrust courts normally avoid direct price administration, relying [instead] on rules and

46

remedies . . . that are easier to administer." (second alteration and omission in original) (quoting *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990)) (internal quotation marks omitted)).

Just as the Supreme Court has acknowledged that the federal courts are "ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing,'" *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) (quoting *Trinko*, 540 U.S. at 408), controlling precedent likewise makes clear that courts are ill-suited to determine which of two would-be monopolists would provide better services to consumers, *see Novell*, 731 F.3d at 1073 ("If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions. That would not only risk judicial complicity in collusion and dampened price competition. It would also require us to become 'central planners,' a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the past."); *see also Pac. Bell Tel. Co.*, 555 U.S. at 452 (noting that the Supreme Court has "repeatedly emphasized the importance of clear rules in antitrust law").

In the end, this case is simple. JetAway "does not ask us to prevent a monopoly or break one apart," *Four Corners*, 582 F.3d at 1226, but asks to be installed as a monopolist. This relief is not available to JetAway, for the identity of the party that necessarily will exercise monopolistic control over the FBO services at the Airport "is a matter of indifference" to the antitrust laws.

*Brunswick Corp.*, 752 F.2d at 267.  Because JetAway has failed to establish that Defendants' conduct reduced competition in the Airport's FBO services market, it cannot establish an antitrust injury.  *See Elliott Indus.*, 407 F.3d at 1124–25; *Ashley Creek*, 315 F.3d at 1254.  Accordingly, in my view, the district court correctly granted summary judgment to Defendants on JetAway's Sherman Act claims.

## IV

Finally, given the per curiam disposition of this appeal, I pause to address certain concerns raised by my very esteemed colleague, Judge Tymkovich, in his own concurring opinion ("Tymkovich Concurrence").  Although that opinion accepts the overarching, fundamental conclusion that JetAway has not established the requisite antitrust injury, it declines to "underwrite some of the specifics" of my analysis.  Tymkovich Concurrence at 1.

In my view, the approach of the Tymkovich Concurrence suffers from two salient, critical flaws.  First, it improperly predicates its substantive Sherman Act analysis, and its view of the antitrust-injury requirement, on a definition of the relevant market that was *never* advanced by the parties.[17]  And, second, its

---

[17] More specifically, the Tymkovich Concurrence *sua sponte* and without reference to the parties' arguments restyles the relevant market.  This newly minted market provides the foundation for the Tymkovich Concurrence's substantive Sherman Act analysis, wherein it concludes that JetAway cannot establish a Sherman Act violation.  As noted above, I do not reach the merits of JetAway's Sherman Act claims and only address the threshold issue of antitrust injury.  I therefore decline to accompany the

(continued...)

48

criticism of this opinion's perspective on whether an antitrust injury may arise where one monopolist replaces another in a natural-monopoly market proves too much: I expressly acknowledge the *possibility* that an antitrust injury may result from the conduct of market participants in a "substitute-monopolist" scenario (but under circumstances not present here). *See supra* n.12. Thus, I respectfully suggest that this strand of the Tymkovich Concurrence's reasoning amounts to a misguided attack on a straw man.

## A

Antitrust cases frequently present a host of intriguing intellectual detours; that is certainly true here. The Tymkovich Concurrence takes one such detour. But I believe the more prudent course in this case is *not* to do so. Rather, I would defer to "the principle of party presentation," which confines a court's analysis to issues that the parties have articulated, not topics of the court's own choosing. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004) (commenting on the court's "duty to undertake an independent examination [of] . . . the dispute, *as framed by the parties*" (emphasis added)); *Utah Poultry Producers Co-op. v. Union Pac. R. Co.*, 147 F.2d 975, 977 (10th Cir. 1945) ("[I]t is not necessary for us to decide this

---

[17](...continued)
Tymkovich Concurrence down a merits path. Nonetheless, for the reasons explicated below, I believe the Tymkovich Concurrence's decision to *sua sponte* reconfigure the market is improper.

[issue], because this is not the issue *as framed by the parties*." (emphasis added)).

In light of this enduring legal principle, the Tymkovich Concurrence's criticism of this opinion's purported "embrace[]" of a "narrowly defined market," Tymkovich Concurrence at 4, is puzzling. The antitrust-injury analysis that I have undertaken is predicated on a relevant market that JetAway itself advanced, that Defendants acknowledged (at least tacitly) as the foundation for their responsive arguments, and that the district court accepted for purposes of adjudicating the summary-judgment issues. In contrast, the contours of the market that the Tymkovich Concurrence *sua sponte* proffers are entirely a product of the Tymkovich Concurrence's own hand. While I do not question its assertion that "a federal appellate court has discretion to affirm a grant of summary judgment on any legal grounds supported by the record," *id.* at 1 n.1, given the posture of this case, I believe that the Tymkovich Concurrence's approach is unwarranted and ill-advised: no one has even hinted at affirming on the alternative grounds it endorses, and the district court did not even have an opportunity to consider, much less rule on, the market that the Tymkovich Concurrence has independently conjured up, *see Arizona v. California*, 530 U.S. 392, 412–13 (2000) (instructing that "courts must be cautious about raising [issues] *sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication").

It is well-settled that the plaintiff bears the burden of defining the relevant

50

market, *see Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991), and, in so doing, must present competent evidence to "make an affirmative showing of [its] proposed relevant market sufficient to sustain a reasonable jury finding," *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002); *see Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 893 (10th Cir. 1991) ("[T]he plaintiff must prove . . . [the] relevant market (including geographic market and relevant product market) in which the alleged [antitrust violation] occurred." (quoting *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 161 (10th Cir. 1986)) (internal quotation marks omitted)).[18] JetAway *never* defined the market before the district court in the manner that the Tymkovich Concurrence would have it—as "the *full cluster of interrelated services* that the Airport offers," Tymkovich Concurrence at 8 (emphasis added)—nor did it name the Airport as the monopolist, *see* Aplt. App. at 3299 (Pl.'s Resp. Br. to Cnty. Defs.' Summ. J. Mot., filed Oct. 1, 2011) ("JCP is the monopolist and the last thing JetAway seeks is to join forces with JCP and share in its monopoly."); *id.* at 3314–15 (arguing that "direct competition between

---

[18]     Whether the plaintiff has alleged a violation of § 1 or § 2 of the Sherman Act is of no moment; the same burden applies. *Compare TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) (requiring proof in a § 1 case that "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade *in the relevant market*" (emphasis added)), *with Full Draw*, 182 F.3d at 756 ("[T]o state a claim for attempted monopolization under Sherman Act § 2, the plaintiff must plead . . . [the] relevant market . . . ." (internal quotation marks omitted)).

JCP and JetAway post RFP would have had additional positive impacts on the quality of FBO services" at the Airport).[19]  Rather, JetAway repeatedly voiced its view that an alleged "agreement for an exclusive monopoly on fuel sales and *FBO services at the Airport* [was] consistent with the anticompetitive behavior the Sherman Act prohibits."  *Id.* at 3322 (emphasis added).

JetAway then sought to substantiate its market definition with Dr. Nelson's research results.  It is patent from even a cursory review of Dr. Nelson's testimony that he conceived of JCP—and not the Airport—as being the monopolist, and the "relevant market" as being the Airport's "FBO Market."  *Id.* at 3186; *see id.* ("JCP is the *only competitor* in the relevant market(s), which implies that its market share is 100%." (emphasis added)); *see also id.* (concluding "that the FBO services at [the Airport] and associated product-specific submarkets are well-defined relevant antitrust markets (both with respect to a 'line of commerce' (product market) and 'section of the country' (geographic market))").  And, when Defendants crossed swords with JetAway, framing the issues for decision, they did not challenge this basic definition of the market.  *See id.* at 2836 (Cnty. Defs.' Summ. J. Br., filed Aug. 31, 2011) (accepting the premise that "JetAway claims entitlement to be *the monopolist FBO at the Airport*

---

[19]    Indeed, in the FAA proceedings referenced in Part III.B.1, *supra*, the parties' presentation of the issues was the same.  *See* Aplt. App. at 190 (FAA Dir.'s Determination, dated Nov. 6, 2006) (addressing JetAway's alleged "right to provide FBO services [at] the Airport" (internal quotation marks omitted)).

52

and bases its damage claim entirely upon being denied monopoly status" (emphasis added)). The district court properly reached its conclusions regarding the relevant market by focusing on the parties' arguments.

The parties also have maintained this perspective regarding the relevant market on appeal. *See* Aplt. Opening Br. at 3 ("This case arises from Defendants' concerted efforts to . . . monopolize the [FBO] market at the [Airport]." (footnote omitted)). True to form, JetAway has continued to frame its arguments in terms of its ability "to compete as an on-Airport FBO," *id.* at 24, and JCP offers no resistance to this description, *see* Aplee. Opening Br. at 49 ("JetAway's claimed antitrust injury is that it, rather than JCP, should be the *sole* FBO at the Airport" (emphasis added)); Aplee. Opening Br. at 59 (discussing JetAway's "alleged lost 'opportunity' to operate an FBO at the Airport").

Yet, with no foothold in the parties' firmly-established arguments, the Tymkovich Concurrence purports to reconfigure and redefine the market out of wholecloth. Given "the principle of party presentation," *Greenlaw*, 554 U.S. at 243, this action—as I see it—is improper. It is well-settled that on appeal, this court reviews a district court's findings regarding the contours of the market under the clearly-erroneous standard. *See Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986). And, on *this record*, I believe any reviewing court would be hard-pressed to conclude that the district court clearly erred in accepting for purposes of its summary-judgment ruling a configuration of

53

the relevant market that was congruent with the parties' arguments—that is, a version of the relevant market defined as FBO services at the Airport—rather than a definition of the relevant market consistent with the Tymkovich Concurrence's creation.

At the end of the day, it is unnecessary for me to determine whether the Tymkovich Concurrence's alternative vision of the relevant market is more appropriate. It would not be proper for me to make such a determination, as the task of defining the relevant market was a matter for the *parties*—not this panel or, more specifically, the Tymkovich Concurrence—to undertake in the first instance. I note that my concurring opinion should not be read as negating the possibility that—were the facts *and* the parties' arguments different—the district court *could* have determined that the Airport was the relevant market and also the extant monopolist.[20] But, as I see it, that line of reasoning is foreclosed on appellate review, as it was never broached by the parties, much less bolstered by evidence. Therefore, it would be inappropriate—not to mention unfair to the parties—to follow the Tymkovich Concurrence's speculative course and resolve the case on a newly minted view of the relevant market.

---

[20] In point of fact, I have expressly limited my conclusions to the facts and evidence presented, *see supra* n.12—just as this court did in *Christy Sports*, 555 F.3d at 1194 n.2 ("We should not be misread as suggesting the implausibility of a rental ski product market within a reasonably well-defined geographic area. We simply hold implausible Christy's attempt to suggest a product market exists in rental skis for destination skiers, disaggregated from the full destination ski experience.").

**B**

The Tymkovich Concurrence also claims to demur to this opinion's antitrust-injury analysis in that it "cannot agree . . . that an upstart in a low-demand, one-firm market can *never* state an antitrust injury." Tymkovich Concurrence at 3 (emphasis added). But nor can I. Indeed, it seems patent that the Tymkovich Concurrence misinterprets my antitrust-injury analysis in this regard.

To be clear, as I see it, this concurring opinion *does not* definitively speak to whether there are circumstances where the antitrust-injury requirement might be satisfied in a monopolist-substitution scenario in a natural-monopoly market. *See supra* n.12 ("[T]o the extent that there actually is an open question regarding whether such predatory or exclusionary conduct could give rise to an antitrust injury where the ultimate result is the replacement of one monopolist with another in a natural-monopoly market, I would leave the resolution of that question for another day."). Again, I find it noteworthy that some commentators have considered the matter an unresolved question. *See* Davis, *supra*, at 774–75; *cf.* Lawrence J. White, *Economies of Scale and the Question of "Natural Monopoly" in the Airline Industry*, 44 J. Air L. & Com. 545, 573 (1979) (hypothesizing that "[n]atural monopoly is not a serious problem for the airline industry," but cautioning that factors such as "the recent introduction of fare flexibility" suggest the need for "very close scrutiny" (internal quotation marks omitted)). Others

55

have more strongly suggested that such a substitution *could* give rise to an antitrust injury. *See, e.g.*, III *Areeda*, *supra*, ¶ 658b3, at 177–78. On these facts, however, I believe the more advisable approach is to avoid definitively staking out a position on this issue.

Critically, to the extent that an antitrust injury could arise when one monopolist replaces another in a natural-monopoly context, the authorities suggest that such injuries are likely to stem from exclusionary practices that have been historically condemned by the antitrust laws. *See, e.g.*, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) ("Examples of such offenses include price-fixing schemes, as well as certain types of group boycotts, market allocations, and tying arrangements."); *cf.* IA *Areeda*, *supra*, ¶ 224e, at 126 ("[S]ubstitution of one monopolist for another is not an antitrust violation; the only compelling cases for antitrust violations occur in the rare instances when the government is a market participant engaging in a horizontal conspiracy with private market participants."). The principal authorities cited by the Tymkovich Concurrence actually serve as exemplars of conduct traditionally viewed as inimical to competition. *See Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 991 (D.C. Cir. 1977) (holding that a restrictive covenant could implicate the antitrust laws only if "acquired or maintained by exclusionary, unfair, or predatory means" (internal quotation marks omitted)); *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 393 (4th Cir. 1974) (involving allegations that "defendants

[had] deliberately set their advertising rates below cost and [had] made deceptive statements . . . to eliminate [a rival] from competition" (footnote omitted)); *Union Leader Corp. v. Newspapers of New Eng., Inc.*, 284 F.2d 582, 586 (1st Cir. 1960) (reviewing the district court's finding that one newspaper "resorted to 'private concessions,' that is to say, secret discriminatory rates," which it held "to be an unfair practice evincing an exclusionary intent"). Accordingly, I do not foreclose the possibility that, under certain circumstances, a would-be monopolist in a natural-monopoly market *could* successfully establish an antitrust injury. I wish to emphasize, however, that this could be true *if and only if* the would-be monopolist first presented competent evidence of conduct historically condemned as anticompetitive by the antitrust laws. And that is not true in this case.

JetAway has established nothing more than that it sought to supplant JCP as the monopolist in the Airport's FBO services market—that is, to be the substitute monopolist—and that Defendants allegedly prevented it from doing so by means of various corrupt and unlawful practices. In particular, JetAway has not pointed to, much less offered evidence of, predatory or other exclusionary conduct of the kind that the antitrust laws have historically proscribed.[21] The conduct at issue

---

[21] Notably, the Tymkovich Concurrence seizes upon Professor Areeda's teaching that "competition *for* a natural monopoly can be just as beneficial to consumers as competition within an ordinary market." III *Areeda*, *supra*, ¶ 658b3, at 178. But its reliance on this teaching does not get the Tymkovich Concurrence out of the starting blocks. In particular, it is significant that this language appears in a passage seeking to clarify that an "unlawful exclusionary practice" may give rise to an antitrust injury, even

(continued...)

57

here more closely resembles that complained of in bid-selection cases. *See, e.g.*,

*Expert Masonry*, 440 F.3d at 348 (observing that "parties may break a host of

state or federal laws and regulations in making a side deal or in otherwise

---

[21](...continued)
in a natural-monopoly context. *Id.* at 177 (italics omitted). However, as explained *supra*, I acknowledge—and do *not* categorically reject—that same possibility. JetAway's inescapable problem is that it cannot point to an unlawful practice that has been historically condemned by the antitrust laws as the source of its injury. Likewise, the Tymkovich Concurrence cannot escape the critical fact of this case, as established by JetAway's own expert, Dr. Nelson: that any benefits to consumers associated with a period of competition between JetAway and JCP would only have been temporary. And, as a matter of law, *see supra* Part III.B.2, I *cannot* (and therefore *do not*) permit these temporary effects to dictate my conclusions regarding whether Defendants' conduct has had a competition-reducing (i.e., anticompetitive) impact on the Airport's FBO services market. The Tymkovich Concurrence, however, resists this legal conclusion. It contends that this opinion's reliance on two cases is misguided because those cases involved temporary *reductions* in competition—*see Adaptive Power Solutions*, 141 F.3d at 952; *Colo. Interstate Gas Co.*, 885 F.2d at 697—not, as posited here, temporarily enhanced competition, *see* Tymkovich Concurrence at 13 n.6. However, I offer those authorities only to support the overarching point, which courts have recognized, that in the antitrust arena ordinarily it is not appropriate to predicate *any* conclusions about the impact of market-participant conduct on temporary effects—irrespective of whether they result in short-term *increases* or short-term *decreases* in competition. Such ephemeral effects cannot serve as a reliable bellwether of the *overall* impact of participants' conduct on the relevant market, "[i]n part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects." *Copperweld Corp.*, 467 U.S. at 767–68; *see also* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 8 (1984) ("[E]xplanations may show how cooperative practices (or practices that exclude or harm rivals), which appear at first glance to be restrictive, will have longer-run benefits in competition."). Furthermore, to the extent that the Tymkovich Concurrence attempts to posit *possible* long-term effects of such head-to-head competition between JCP and JetAway, it engages in pure conjecture and speculation, which, par for the course, finds no grounding in the parties' arguments. *See, e.g.*, Tymkovich Concurrence at 14–15 ("[D]uring the one-year competition period forecasted by JetAway's expert, pilots and airlines *could* play one FBO against the other for the best long-term deals—futures contracts, essentially—thus preserving lower prices for a longer term than the competition period itself." (emphasis added)).

circumventing the bidding process" without implicating the antitrust laws). And, as the Supreme Court instructs, "[t]he Sherman Act does not require competitive bidding." *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 694.

Alternatively, this case at least arguably might be analogized to the selection of an exclusive distributor for a given market—a species of conduct that also has *not* been historically condemned by the antitrust laws. *See Westman Comm'n Co.*, 796 F.2d at 1225 (highlighting "[a] manufacturer's ability to limit its distributorships"); *Blankenship v. Herzfeld*, 661 F.2d 840, 844 (10th Cir. 1981) (defending "[a] supplier['s] . . . right to unilaterally select and terminate its own distributors"); *cf. Watkins & Son Pet Supplies v. IAMS Co.*, 254 F.3d 607, 616 (6th Cir. 2001) ("To the extent [Plaintiff] is claiming that it suffered an injury as a result of termination of its distributorship, we find . . . that while a contract or tort claim might lie, an antitrust claim does not . . . ."); *see also* Davis, *supra*, at 742 ("Choosing A over B as one's exclusive distributor . . . is not an antitrust violation at all.").

Yet, even assuming that some misconduct akin to such bidding or exclusive-distributor selections *could* rise to the level of an antitrust violation—a reasonable assumption I have made for purposes of my antitrust-injury analysis, *see supra* n.9—it is clear that JetAway still would be without redress. The Achilles's heel for JetAway remains its failure to show that any injury that it has suffered from Defendants' behavior also has had an anticompetitive effect.

59

Vague allusions to the quality of FBO services or reduced prices cannot overcome this defect. *Cf. NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 459 (6th Cir. 2007) (en banc) (noting that the plaintiff could not demonstrate having "suffered an antitrust injury, as opposed to the ill effects of price competition, which understandably hurts, but which does not by itself state a cognizable antitrust claim," and that "[o]therwise, every time an allegedly superior product or a lower-cost alternative was eliminated from the market by competition, the producer of that product would have antitrust standing" (citation omitted) (internal quotation marks omitted)). One commentator's view of the issue is especially apt when considering JetAway's claims: "No antitrust statute or rule creates a vested right to go on doing business, in perpetuity, in a way that is familiar, comfortable, or profitable." Davis, *supra*, at 751.

Furthermore, I underscore that the "substitution-of-monopolist" rule articulated *supra* is by no means painted in the broad brushstrokes that the Tymkovich Concurrence suggests. This rule does not perforce safeguard the incumbent monopolist; to the contrary, it is clearly *indifferent to* the identity of the market actors. More specifically, it is indifferent regarding whether the monopoly is ultimately possessed by the incumbent or the challenger. Stated otherwise, under different facts—such as those involving practices historically condemned by the antitrust laws—a firm like JetAway *possibly* could mount a legally cognizable objection to being excluded from the relevant market. But

those facts simply are not present here; so, although *in this case* the effect of the "substitution-of-monopolist" rule is to insulate the incumbent (JCP) from liability, that would not necessarily be true in different settings.

In sum, the Tymkovich Concurrence proceeds on a false premise: that this opinion completely rejects the possibility of an antitrust injury resulting from one monopolist replacing another in a natural-monopoly setting. This is an untenable mischaracterization of the instant opinion's reasoning and conclusions. Consequently, although its analysis strives mightily (and might carry the day under different circumstances), I respectfully suggest that the Tymkovich Concurrence has only succeeded in defeating a straw man.

## V

For the reasons stated herein, I would **AFFIRM** the district court's grant of summary judgment to Defendants.

*JetAway Aviation, LLC v. The Board of County Commissioners of the County of Montrose, Colorado, et al.*, 12-1173

**TYMKOVICH**, J., concurring.

JetAway has spun a sordid tale of small-town politics, but it has not described an injury the antitrust laws were designed to protect. And because JetAway cannot establish an antitrust injury, I join the per curium opinion that affirms the district court's decision below. Beyond this general level, however, I part company with the reasoning Judge Holmes employs in his concurring opinion ("Holmes Concurrence") to reach this conclusion. Indeed, given the analytical path down which the parties have guided the court—a path the Holmes Concurrence instinctively follows—I cannot underwrite some of the specifics of Judge Holmes's analysis. Proceeding along a different path compelled by the law, even one not specifically advanced by the parties, is the only way to recognize the realities of the antitrust principles at play in this case.[1]

In particular, I disagree that this entire case is an instance of JetAway seeking to merely substitute one monopoly for another. Part of this case certainly falls under that analysis, namely, the portion of the case relating to the County's choice in 2005 to solicit bids for a private fixed-base operator. Whichever entity

---

[1] It is widely accepted, if not axiomatic, that a federal appellate court has discretion to affirm a grant of summary judgment on any legal grounds supported by the record. *Signature Dev. Cos. v. Royal Ins. Co. of Am.*, 230 F.3d 1215, 1218 (10th Cir. 2000). And while we lack a "*carte blanche* to depart from the principle of party presentation," *Wood v. Milyard*, 132 S. Ct. 1826, 1833 (2012), it is nonetheless appropriate to employ an alternative line of reasoning where the parties' stipulation leads to a doctrinally unsustainable analysis. *Cf. Arizona v. California*, 530 U.S. 392, 412–13 (2000).

won the bid would assume the County's role of operating the single on-airport FBO. Thus, whether the bid process was clean or corrupt, the before-and-after picture is the same: one on-airport FBO. That scenario does not benefit consumers of FBO services.

But the same reasoning does not apply to defendants' *post-bid efforts* to prevent JetAway from becoming a second FBO. The relevant market is the Airport, and the Airport has no duty to allow competition for services on its premises. To avoid this conclusion, the defendants credit, and the Holmes Concurrence adopts, a narrower definition of the market—"FBO services at the Airport." And since the demand for FBO services would be insufficient to support two FBOs, the before-and-after picture will likely be the same: one on-airport FBO. Under this view, the competition for a natural monopoly is an "elimination bout" with the consumer an uninterested spectator. Thus, no antitrust injury.

Assuming the relevant market is a "natural monopoly," I still think competitive forces could play a pro-consumer role. Although Judge Holmes's reasoning is appealing on its surface, its logic is actually a self-fulfilling prophecy. If demand in a certain market is so low that only one firm can survive, then whether the incumbent firm behaves as a monopolist depends entirely on the rule we adopt. If, as Judge Holmes reasons, the incumbent firm is insulated from antitrust liability because it got there first, then the incumbent will indeed behave

2

as a monopolist—because we said it can.  But if, as I believe, the incumbent firm deserves no privileged position simply by virtue of already being there, then the very threat of an upstart entering the market will at least marginally constrain the incumbent's ability to extract monopoly rents.  That *does* benefit consumers.  And in any event, we have no right to enshrine the incumbent in its monopoly position simply because it is already there.  That choice belongs to consumers.

Thus, I cannot agree with the implications of the Holmes Concurrence; namely, that an upstart in a low-demand, one-firm market can never state an antitrust injury.[2]  I believe this reasoning would establish a wrongful precedent, and is unnecessary in any event.  Yes, JetAway fails to state an antitrust injury with respect to defendants' post-bid efforts to prevent JetAway from becoming a second FBO, but for a much simpler reason: JetAway is actually seeking to join the *Airport's monopoly* over services on its premises.  It is well established that seeking to join a monopoly does not benefit consumers, and therefore states no antitrust injury.

I therefore write separately to explain what I believe to be the correct reasoning.

---

[2]  Judge Holmes constructively attempts to circumscribe the scope of his concurrence by acknowledging that his recommended "rule does not perforce safeguard the incumbent monopolist."  Holmes Concurrence at 60.  While I certainly agree, that conclusion is significantly concealed by an approach, which, in so many ways, drives at its antithesis.  An attentive reader might find the limiting principle, but the incautious reader will find authority that acts as bulwark for the incumbent in a natural-monopoly market.

# I. Analysis

There are two complementary methods of demonstrating the failure of JetAway's antitrust claims: "by reference to the proper definition of a market or by reference to the absence of anticompetitive conduct." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1193 (10th Cir. 2009). I will discuss each in turn, beginning with market definition.

## A. *Market Definition*

JetAway brings claims under both Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2). "To state a cause of action for conduct prohibited under § 2 of the Sherman Act, the plaintiff must define a relevant market within which the defendants allegedly engaged in anticompetitive behavior." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1117 (10th Cir. 2008).

For purposes of summary judgment, the district court accepted JetAway's expert's definition of the market as "FBO services at the Airport." Aplt. App. at 6865. The Holmes Concurrence also embraces this narrowly defined market. *See* Holmes Concurrence at 20–21, 35. But in my view, this definition misapprehends the relevant airport market, and does not reflect the underlying economic reality at play.

"The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal . . . ." *Christy Sports*, 555 F.3d at 1194. Thus, a ski resort may monopolize the market for ski rentals within the

4

resort, *id*. at 1193–96; a hospital may monopolize the market for services within the hospital, *Four Corners Nephrology Associates, P.C. v. Mercy Medical Center of Durango*, 582 F.3d 1216, 1221–25 (10th Cir. 2009); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 480 n.5 (7th Cir. 1988); and a stadium may monopolize the sale of food within the stadium, *Elliott v. United Center*, 126 F.3d 1003, 1004–05 (7th Cir. 1997). This result flows from the fact that skiers do not go to ski resorts simply to rent skis, patients do not go to a hospital simply for a single service, and sports fans do not go to a stadium simply to eat food. *See Elliott*, 126 F.3d at 1005. Rather, they purchase a package of related services. "To define one small component of the overall product as the relevant product market is simply implausible." *Christy Sports*, 555 F.3d at 1194.

The fact that a hospital, ski resort, or stadium might contract with a third party to provide a specific service does not change this:

> [O]ne is hard-pressed to see any [antitrust] violation in an agreement between, say, Disneyland and McDonald's, that gives McDonald's the exclusive right to operate restaurants in the Disneyland park, even if the result is that McDonald's charges higher food prices in the park than prevail outside. Disneyland could certainly choose to operate its own restaurant in its own park with exactly the same result, and the franchise agreement with McDonald's would be simply an alternative way of capturing those rewards.

I Phillip E. Areeda et al., *Antitrust Law* ¶ 209e3, at 315 (3d ed. 2007) ("*Areeda*").

5

Although the Montrose Airport is no Disneyland, a materially identical situation prevails here.  No one disputes that the Airport may control access to its own premises, nor that FBO services are among the many types of services airlines, pilots, and passengers enjoy when visiting the Airport's premises.  Thus, the Airport may operate its own FBO (as it has done in the past), it may operate its own FBO alongside a competitor (as it has also done in the past[3]), it may permit a single concessionaire to take over its FBO operations (as JCP has), and it may permit additional concessionaires to operate FBOs (as JetAway desires).  As far as the antitrust laws go, none of these scenarios presents a problem.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage.").  Indeed, if this was a private airport, I suspect all parties would have recognized this from the outset.  *Cf*. IA *Areeda*, ¶ 224e2, at 128 ("[A] private airport is ordinarily free under the antitrust laws to decide that a single FBO is sufficient.").

Of course, one might argue that the public nature of the Airport (recognizing the Montrose County Building Authority's role) distinguishes it from a private business.  Many of the cases expounding on the power of a business to restrict competition on its premises rely on the need to allow private firms to

---

[3]  For several years prior to 1991, the County had two full-service, on-airport FBOs—a privately run FBO and the County's own FBO.  Aplt. Opening Br. at 6–7.

recoup their investment. *See, e.g.*, *Christy Sports*, 555 F.3d at 1194; *Elliott*, 126 F.3d at 1005; *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (internal quotation marks omitted; alterations incorporated)).  But this same need can apply to public entities as well as private. A public airport, just like a private airport, must somehow pay for the cost of building, maintaining, and perhaps upgrading its facilities, along with many other expenses.  Thus, for example, a large airport like Denver International Airport might strictly control its concessionaires and the services they supply.  But from an antitrust perspective, I see no reason to allow a private firm to choose with whom it will deal but not allow a public entity the same freedom.

An aspiring entrant into an airport's "market" might question a public airport's statutory authority to monopolize a market within its boundaries, to choose with whom it will deal, or to grant an exclusive concession.[4]  But "the authority of the public [entity] to act restrictively [within its 'business'] should be challenged in the customary manner for judicial review of administrative action

---

[4] JetAway's expert was instructed to assume that the County was "acting in a proprietary capacity as the operator of the Montrose Airport and as the historical provider of FBO services at the Airport," but "[o]nce the County decided to privatize the Montrose Airport, the County was obligated to select one or more private FBOs . . . through a competitive bidding process to promote public interests."  Aplt. App. at 4842.

that is unauthorized by or inconsistent with the relevant statutes governing those [entities]." I *Areeda*, ¶ 209e3, at 316. Indeed, JetAway has already brought such proceedings in state court and before the FAA. Aplt. Opening Br. at 16–21. But, again, these are not concerns to be enforced through federal antitrust laws. *Cf. NYNEX*, 525 U.S. at 137 ("[O]ther laws [besides the Sherman Act], for example, unfair competition laws, business tort laws, or regulatory laws, provide remedies for various competitive practices thought to be offensive to proper standards of business morality."). In principle, this logic applies to private and public entities alike.

In sum, "FBO services at the Airport" is not a relevant market. Instead, the market includes the full cluster of interrelated services that the Airport offers. Without its narrowly constructed market definition, JetAway has no Sherman Act claim based on defendants' efforts to thwart JetAway's desire to establish an FBO at the Airport. As I see it, the Airport faced no antitrust exposure for its decision to retain a single FBO.

### B. Antitrust Injury

For similar reasons, JetAway has failed to allege a cognizable antitrust injury. "[A] plaintiff can recover [under the antitrust laws] only if [its] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original). As the district court recognized, JetAway alleges two distinct

8

anticompetitive injuries: (1) efforts allegedly to corrupt the bid process, and (2) efforts allegedly to maintain JCP as the exclusive FBO. Aplt. App. at 2645. Neither allegation satisfies the "competition-reducing" requirement.

### 1. The Bid Process

Before the County called for bids, it ran the Airport's sole on-airport FBO. There had been no competition for over ten years. The County then ostensibly opened the bidding for the chance to assume the County's FBO operations. JetAway claims that JCP's connections to the County made the result of the bidding a foregone conclusion, and even insinuates that JCP had an opportunity to change its bid in response to JetAway's.

The question, then, is whether a corrupt bid process reduces competition when the parties are bidding for an exclusive concession—or more specific to this case, when the parties are bidding to take over a portion of the monopolist's business that the monopolist had been running itself. The answer is no. Even had the bid process been clean, the result is the substitution of one firm for another, leaving competition—or the lack thereof—unchanged. "[S]ubstitution of one monopolist for another is not an antitrust violation." *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1014 (2013) (quoting IA *Areeda*, ¶ 224e, at 126) (alteration in original).

With this much, I agree with Judge Holmes. The fact that JetAway had been operating a through-the-fence FBO does not change this. Even if we

9

considered JetAway's off-airport operations relevant to the preexisting state of competition, the result from the consumer's standpoint is either the same or worse. When JetAway lost the bidding process, the status quo remained: one on-airport FBO and one off-airport FBO. Had JetAway won the bidding process, the consumer would have been left with a single FBO. Accordingly, JetAway cannot state a harm to competition with regard to the bid process at issue in this case, even if it was corrupt.

### 2. Post-Bid Efforts to Prevent a Second FBO

JetAway's other claim that defendants have conspired to exclude a second FBO likewise fails.

Again, no one disputes that the Airport may control its own premises. Thus, if the district court enjoined the Airport to allow JetAway to open an on-airport FBO, we would then have two on-airport FBOs, both operating under the Airport's control. JetAway assumes that such an arrangement would lead to competition, but the Airport has no antitrust duty to allow competition on its premises. In that respect, the Airport is like the defendant hospital in our recent *Four Corners Nephrology* decision. A nephrologist, Dr. Bevan, had sued a hospital under the antitrust laws to force the hospital to give him staff privileges, allowing him to compete with the hospital's in-house nephrology department. But, we said,

10

> even if we were to force [the hospital] to accommodate Dr. Bevan's demand, the hospital could simply impose costs and conditions on Dr. Bevan's activities that would prevent him from undercutting the hospital's own nephrology practice. Dr. Bevan very well might be better off with such a shared monopoly, but there's no guarantee consumers would be. Whatever injury he may have suffered, then, it is not one the antitrust laws protect.

*Four Corners Nephrology*, 582 F.3d at 1226; *see also* IIIB *Areeda*, ¶ 773, at 239 ("When the monopolist is forced to sell [to a competitor], it sets the monopoly price and overall competitiveness is not affected at all; we simply have two firms sharing the monopoly rather than one."). In short, JetAway "is not a victim of antitrust injury, for there is no antitrust right to join a cartel." IIA *Areeda*, ¶ 348e1, at 217.[5]

### 3. The Holmes Concurrence's Analysis

The foregoing analysis suffices to dispose of JetAway's claim that defendants have conspired to exclude a second FBO. Judge Holmes, however, employs different reasoning in his concurrence. By merging JetAway's claims related to the corruption of the bid process with its claims that defendants subsequently orchestrated to prevent JetAway from becoming a second FBO, Judge Holmes relies exclusively on the substitution-of-monopolist rule to reject

---

[5] JetAway concedes that the County's efforts to shutter JetAway's through-the-fence FBO have no relevance here. Aplt. Opening Br. at 20 n.19 ("The disputes between the County and JetAway concerning its former off-Airport operation, closed now for over 3½ years, are irrelevant to JetAway's antitrust claims asserted herein.").

11

the latter claims. Because the circumstances underlying each claim are distinct, I believe the Holmes Concurrence underestimates the scope of its premise with respect to the injury alleged concerning the post-bid process.

Judge Holmes, like defendants, bases his conclusion regarding defendants' post-bid exclusionary efforts largely on JetAway's expert, who opined that the relevant market was "FBO services at the Airport" and, in his view, "[t]here is only enough demand for FBO services at the Airport to support one FBO." Aplt. App. at 3190. In estimating JetAway's damages, the expert also assumed that competition between JCP and JetAway—if permitted—would last only about a year, after which JetAway would prevail. Aplt. App. at 4834, 4981, 6959. Defendants therefore argue: (1) the short period of competition JetAway's expert anticipates is not enough to state an antitrust injury, and (2) ultimately JetAway is seeking to substitute one monopolist for another. Defendants argue, in essence, that providing FBO services at the Montrose Airport is a natural monopoly. *Cf*. Richard A. Posner, *Economic Analysis of Law* § 12.1, at 460 (8th ed. 2011) ("[I]f a market is small enough, almost any kind of firm can have a natural monopoly—a grocery store in a village, for example—because every firm has some fixed costs, and they may dominate total costs if demand is low enough.").

This reasoning goes down an anticompetitive path. Defendants have cited no persuasive authority for the notion that a projected short period of competition (should the plaintiff prevail on its antitrust claim) somehow vitiates antitrust

injury. Indeed, defendants' cited authorities stand for the converse. In *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947 (9th Cir. 1998) and *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243 (D.C. Cir. 1987), courts found insufficient antitrust injury because the *lack* of competition lasted only a short time.[6] In other words, competition existed, then disappeared for a short time, then reappeared. That is not this case. Here, competition has disappeared at the Airport, but would *reappear* if JetAway could win this lawsuit, and then might disappear about a year later.

The crucial problem with defendants' argument is the failure to distinguish the significance of the Airport's ownership of its premises from the significance of low demand. As explained previously, it is the Airport's control over concessionaires that undermines JetAway's claim of antitrust injury— concessionaires may only compete on the terms set by the concession-granter, which do not altogether coincide with the interests of the consumer. But defendants argue (and Judge Holmes agrees) that low demand (or the "natural

---

[6] The Holmes Concurrence also cites *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683 (10th Cir. 1989) as authority supporting the position that temporary anticompetitive effects are insufficient to state an antitrust injury. *See* Holmes Concurrence at 30–32, 57–58 n.21. Like *Adaptive Power Solutions* and *Williamsburg Wax*, that case addressed a situation involving a transitory period with *reduced* competition. *Colo. Interstate Gas Co.*, 885 F.2d at 696–97. *Colorado Interstate Gas Co.* is also inapplicable because our holding alternatively rested on the fact that "[t]here was no reasonable chance, let alone a dangerous possibility" that defendants' conduct could actually create a monopoly at all. *Id.* at 695.

13

monopoly"), regardless of the Airport's control of its own premises, is enough to invoke the substitution-of-monopolist rule.

Assuming for sake of argument that a public airport has a duty to open its premises to freewheeling concessionaire competition, its failure to do so is—right now—reducing competition, which is the essence of antitrust injury. This is so even if the sought-for competition is inevitably a winner-take-all contest. "[C]ompetition *for* a natural monopoly can be just as beneficial to consumers as competition within an ordinary market." III *Areeda*, ¶ 658b3, at 178 (emphasis in original). Among other things, the threat of potential competition for a natural monopoly will force the incumbent to lower its prices, knowing that upstarts may be waiting in the wings. *Id.* In any event, during the one-year competition period forecasted by JetAway's expert, pilots and airlines could play one FBO against the other for the best long-term deals—futures contracts, essentially—thus preserving lower prices for a longer term than the competition period itself. And again, as long as the victor knows that an upstart could potentially invade its market, monopoly pricing power is constrained.[7]

---

[7] In response to Judge Holmes's discussion about the limits of the judiciary to select the superior monopolist in an antitrust case, Holmes Concurrence at 40–48, I note that I reach my conclusion without any judgment on whether JetAway could ultimately provide better FBO services for consumers. Yes, Judge Holmes is right that the specific "identity of a monopolist is of no concern to antitrust law." *Id.* at 45. But the identification of a possible upstart to challenge an incumbent's monopoly in a one-firm market is an entirely different inquiry that does not evaluate which monopolist should (or will) carry the day. The existence of a challenger in a low-demand market can enhance

(continued...)

14

I am not aware of any principle of antitrust law which can convert such competition-enhancing possibilities into a lack of antitrust injury. "If monopoly power can be used to beget monopoly, the [Sherman] Act becomes a feeble instrument indeed." *United States v. Griffith*, 334 U.S. 100, 108 (1948), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 763 n.8 (1984). Indeed, defendants offer, and the Holmes Concurrence appears to accept, what is essentially the shoot-the-moon theory of antitrust law: as long as a firm succeeds in capturing a low-demand market, it may violate the Sherman Act in every way possible to acquire and maintain that position. Recognizing this decision's potential to authorize an incumbent monopolist to use such exclusionary tactics to maintain its power within a "natural-monopoly" market, the Holmes Concurrence—primarily within a lengthy footnote—designates this issue an "open question." *See* Holmes Concurrence at 27–28 n.12, 55. This question, says Judge Holmes, is to be left for another day. But the logic and rule of law espoused by the Holmes Concurrence inevitably answer this question by sanctioning the incumbent's monopolistic behavior in any one-firm market. Judge Holmes and defendants reach this unfortunate conclusion by adopting the conclusion of JetAway's expert, but the principle supporting the argument cannot be confined to this case. In subsequent cases, were the Holmes

---

[7](...continued)
competition and benefit consumers regardless of whether it should (or will) ultimately unseat the controlling monopolist. *See* III *Areeda*, ¶ 658b3, at 177–78.

15

Concurrence to control, other defendants would hire their own experts to testify that demand can only support one firm—the obvious implication being that the incumbent defendant should remain enthroned because it happens to already be there.[8]

And in the antitrust realm, there is every difference in the world between a monopolist anointed by consumers and a monopolist anointed by itself. *See Trinko*, 540 U.S. at 407–08 (distinguishing those who obtain monopoly power through "superior product, business acumen, or historic accident" and those who obtain it through "anticompetitive conduct" (emphasis removed)); *United States v. Aluminum Co. of America*, 148 F.2d 416, 429 (2d Cir. 1945) ("[T]he origin of a monopoly may be critical in determining its legality."). Thus, the incumbent newspaper in a town too small to support more than one paper may not defend an antitrust suit by asserting that one paper or the other will inevitably fail: "Where there is no identity of performance we will not say that the public does not have an interest in competition even though that competition be an elimination bout." *Union Leader Corp. v. Newspapers of New England, Inc.*, 284 F.2d 582, 590 n.4 (1st Cir. 1960); *see also Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d

---

[8] Indeed, the underlying rationale extends much further. The Holmes Concurrence's position ultimately rests on the futility of permitting competition when one firm is certain to prevail eventually. But if futility is an available argument, then a defendant can win an antitrust case simply by convincing the jury that its product is superior to the plaintiff's and therefore competition will be futile because plaintiff's business will eventually fail, leaving the market unchanged.

391, 397 (4th Cir. 1974) ("[E]ven if we proceeded on the assumption that one of the [competing papers] must fail, deliberate exclusionary conduct would still support a charge of attempted monopoly. . . . [T]he antitrust laws need not tolerate exclusionary conduct whenever it appears that only one competitor can survive the preliminary bout."). Nor can the incumbent sports team in a town with only enough demand for one franchise avoid antitrust liability on that premise:

> To hold otherwise could effectively mean that a defendant is entitled to remain free of competition unless the plaintiff can prove, not only that he would be a viable competitor, but also that he and defendant both would survive. This result would be ironic indeed: we cannot say that it is in the public interest to have the incumbent as . . . its sole football team, merely because the incumbent got there first.

*Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 991 (D.C. Cir. 1977).

There is no good reason to treat airport FBO services differently. Assuming, again, that the Airport must open its premises to FBO competition, and that the Airport has only enough demand for one FBO, "[the] choice [between the upstart and the incumbent in a natural monopoly] should in the first instance be made by consumers." III *Areeda*, ¶ 658b3, at 178. And JetAway in fact argues in this case that its now-shuttered through-the-fence FBO could provide better services to the consumer in the form of a more convenient location, larger hangar

17

and terminal, more ramp space, and more fueling capacity. *See* Aplt. Opening Br. at 32–33.

To be sure, a defendant may offer evidence of low demand to support an argument that it operates in a natural monopoly—but this only rebuts any inference of illegality flowing from the defendant's position as a monopolist. *See Hecht*, 570 F.2d at 990; *Greenville Publ'g*, 496 F.2d at 397. Nonetheless, "the fact that a market is a natural monopoly should not operate as a guarantee that a particular incumbent is entitled to be the natural monopolist; a more aggressive rival might be a more efficient occupant of the same position." III *Areeda*, ¶ 658b3, at 177; *cf.* IIA *Areeda*, ¶ 348, at 215 ("Even when a monopoly appears inevitable—which is seldom certain—antitrust does not become indifferent to the tactics employed by the victor. Thus, once pricing is determined to be predatory, the defendant would not escape liability to its immediate victim by asserting, or even proving, that monopoly is inevitable in this market.").

Finally, defendants' overarching substitution-of-monopoly argument depends entirely on assumptions about demand. But natural monopolies can evaporate as circumstances change, and demand is a circumstance that can fluctuate wildly. Prospectors in the Uncompahgre Valley could discover a new mineral deposit and Montrose could become a mining boomtown, leading to increased traffic at the Airport and enough demand for two or more FBOs. *Cf.* III *Areeda*, ¶ 658b3, at 177 (arguing against giving protected status to an incumbent

18

natural monopolist because, among other reasons, "technology may change a market from a natural monopoly to one in which rivalry is efficient" and any protected natural monopolist would have an incentive to stifle such innovation).

"[T]he ultimate issue is whether the plaintiff (1) seeks to join the exclusive arrangement while leaving the exclusivity requirement otherwise intact; or (2) seeks to forbid exclusivity, first on its own behalf, and implicitly on behalf of others." IIA *Areeda*, ¶ 348e1, at 217. JetAway sees itself under the second prong, and as between the second prong and the Holmes Concurrence's substitution-of-monopoly argument, JetAway is closer to correct.

Unfortunately for JetAway, the closest to correct is actually the first prong. As noted, this case turns not on demand for FBO services at the Airport, but on the Airport's control of its own premises. The Airport has no antitrust duty to open its premises up to concessionaire competition. If it *did*, however, then the demand-created natural monopoly would be no defense to antitrust liability.

## II. Conclusion

For the reasons stated above, I would affirm the judgment of the district court.